# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

IN THE MATTER OF THE DEPENDENCY OF

C.E.T.,

Minor Child

ROGER TOLBERT,

Appellant,

v.

STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES,

Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 73265-0-I
(consolidated with No. 73266-8-I)

DIVISION ONE

UNPUBLISHED OPINION

FILED: November 23, 2015

SPEARMAN, C.J. — Roger Tolbert appeals the trial court's order terminating his parental rights to his daughter C.E.T. Tolbert argues that the trial court erred in concluding (1) that the Department of Social and Health Services (DSHS) expressly and understandably offered or provided all necessary and reasonably available services capable of correcting his parental deficiencies within the foreseeable future; (2) that there was little likelihood that C.E.T. could be returned to his care in the near future; and (3) that continuation of the parent-child relationship clearly diminished C.E.T's prospects for early integration into a stable and permanent home. Because the trial court's unchallenged findings support its conclusions of law, we affirm the termination of Tolbert's parental rights.

## FACTS

Tolbert is the father of C.E.T., who was born on August 26, 2013. At birth, C.E.T. and her mother, Sarah Freudenberg, both tested positive for methamphetamine. Tolbert

and Freudenberg both denied using methamphetamine, and Tolbert speculated that one of his former roommates "dropped it into the mother's mouth while she was sleeping." Verbatim Report of Proceedings (VRP) (Dec. 18, 2014) at 12.

Because of her prenatal drug exposure, C.E.T was admitted to the neonatal intensive care unit (NICU). Tolbert slept most of the time during C.E.T.'s stay in the NICU and frequently could not be roused even when C.E.T. cried loudly or nurses attempted to wake him to feed C.E.T. A nurse was concerned that Tolbert was exhibiting signs of "coming down" from using methamphetamine. VRP (Dec. 9, 2014) at 84. When awake, Tolbert exhibited concerning and unpredictable behavior. He yelled at hospital staff and threatened to disrupt C.E.T.'s medical procedures. He also engaged in a loud, profanity-filled argument with the mother, waking C.E.T. Tolbert left the hospital for long periods of time, occasionally in the middle of feeding C.E.T., and returned with dilated pupils and slurred speech. Tolbert also stole a cell phone from a nurse and attempted to sell it.

The hospital contacted DSHS, which held a family team decision meeting (FTDM) on September 3, 2013. Tolbert continued to deny methamphetamine use, but agreed to submit a urine sample that day. DSHS social worker Katie Lloyd referred Tolbert to a urinalysis testing facility "which was down the road," but Tolbert failed to go. VRP (Dec. 18, 2014) at 17. Tolbert also denied that he had any mental health issues that would explain his behavior, but later during the meeting stated that he suffered from anxiety and depression.

DSHS filed a dependency petition. Tolbert failed to appear for his dependency trial and a default order of dependency was entered on January 23, 2014. The

dependency court ordered Tolbert to participate in a substance abuse evaluation, random urinalysis testing, a parenting assessment and parenting classes. C.E.T. was placed with Tolbert's brother, Jared Clarkson, and Clarkson's partner, Nicole Curtis. The dependency court authorized Tolbert to visit C.E.T. once a week for four hours.

DSHS social worker Gina Taboada referred Tolbert for urinalysis testing, a substance abuse evaluation and parenting classes in mid-September 2013. DSHS social workers Aleksandr Yevsyugov and Wyndi Horness mailed Tolbert additional referrals to the same services in September and November 2014, respectively. Tolbert did not contact DSHS or engage in any of the services. He visited C.E.T. approximately three times at Clarkson's home in September and October 2013, but after that Clarkson and Curtis did not hear from Tolbert for approximately a year. Tolbert also did not appear for any of the review hearings in the dependency case.

DSHS filed a termination petition. Freudenberg did not appear in response to the petition and her parental rights were terminated by default on September 30, 2014. A trial as to Tolbert's parental rights started on December 8, 2014, by which time C.E.T. was 15 months old. The trial court heard testimony from 13 witnesses over six days and reviewed 11 exhibits.

At trial, Tolbert continued to deny ever using methamphetamine. Tolbert testified that he stopped participating in the dependency case because he had "really bad anxiety" and "didn't know how to deal with [the situation]," but also because he was frustrated with DSHS transferring his case to new social workers and because he was trying to help Freudenberg get into substance abuse treatment. VRP (Dec. 8, 2014) at 47. He also admitted that he had been incarcerated for a portion of the time for a theft

conviction and a pending residential burglary charge. Tolbert stated that he had previously sought treatment for his anxiety but "never followed through with it." VRP (Dec. 9, 2014) at 156. However, he testified "I'm willing to now" and stated he had recently obtained a prescription for anti-anxiety medication. Id. Tolbert testified that he had visited C.E.T. at Clarkson's home six to eight times since August 2014, and that when he visited he would always stay the entire weekend, from Friday to Sunday. He also stated that he had undergone a parenting assessment and substance abuse evaluation on his own, which did not recommend any treatment, and that he planned to start the parenting classes soon.

Julie Larsen, the therapist who conducted Tolbert's parenting assessment, testified that she met with Tolbert approximately two weeks prior to the termination trial for an interview and a parent-child observation session. Larsen also interviewed Tolbert's new wife as well as Clarkson and Curtis. She testified that while Tolbert and his wife claimed that Tolbert had never used any drugs aside from some teenage experimentation with marijuana, Clarkson and Curtis told her that Tolbert had a long history of using methamphetamine and heroin.. Larsen testified that she "absolutely would have significant concerns about [C.E.T.] being placed in [Tolbert's] home" and did not recommend reunification. VRP (Dec. 10, 2014) at 15. She testified that the most critical issue preventing reunification was Tolbert's substance abuse.

Horness, who was Tolbert's DSHS social worker at the time of the termination trial, recommended Tolbert's parental rights be terminated because C.E.T. "has been in care for going on 16 months" and she did not believe Tolbert was "in a position to appropriately parent now or in the near future" because "[h]e doesn't have a good

history of having extended periods of stability" and "hasn't demonstrated an ability to meet [C.E.T.'s] needs on an ongoing basis." VRP (Dec. 19, 2014) at 51-52. She was also concerned that Tolbert's pending residential burglary charge would involve jail time and render him unavailable to parent C.E.T.

Clarkson testified that when C.E.T. was born, Tolbert looked "terrible" and disclosed that he and Freudenberg had been using [methamphetamine]" quite a bit. Id. at 119. Clarkson did not hear from Tolbert between October 2013 and September 2014, when Tolbert called and asked if he could visit C.E.T. Clarkson testified that Tolbert told him that he had been "just kind of floating around" and using methamphetamine throughout the previous year. Id. at 127. Clarkson testified that Tolbert visited C.E.T. three times in September and October 2014, but had not visited since that time, and only one of the visits lasted the entire weekend.

Curtis testified that Tolbert had "been very open about" his methamphetamine use with family members, but had asked her and Clarkson not to tell Larsen about his drug history. Id. at 171. According to Curtis, Tolbert said "there's no way to prove he's done drugs" because he had never done urinalysis testing for DSHS. Id. at 173. Curtis testified that she sent Tolbert monthly Facebook messages about how C.E.T. was doing, and while the messages contained a read receipt indicating they had been viewed, Tolbert never responded. Curtis corroborated Clarkson's testimony that Tolbert had only visited three times and only one visit involved an overnight stay.

After the close of evidence, Tolbert pled guilty in the residential burglary case. Tolbert's guilty plea reflected that the standard range sentence for the crime was three to nine months incarceration.

On February 5, 2015, the trial court issued an oral ruling terminating Tolbert's parental rights. The trial court subsequently entered written findings of fact and conclusions of law consistent with its oral ruling. Tolbert appeals.

ANALYSIS

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the future . . . ; [and]

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). If the State meets its burden under RCW 13.34.180(1), it must then also prove by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(b).

Where the trial court has weighed the evidence, appellate review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.A.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). In determining whether substantial evidence supports the trial court's findings, this court does not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003). Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

Necessary and Reasonable Services

Tolbert contends that the trial court erred in terminating his parental rights because the State failed to prove that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided" as required by RCW 13.34.180(1)(d). In particular, he contends that DSHS should have offered him mental health, housing and anger management services.

A service is necessary within the meaning of the statute if it is needed to address a condition that precludes reunification of the parent and child. In re Welfare of C.S., 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). The services offered must be individually tailored to a parent's specific needs. In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004). However, even if DSHS fails to offer or provide necessary services, this element may still be met if there is evidence in the record from which the trial court could have concluded that such services would not have remedied parental deficiencies "in the 'foreseeable future.'" In re Welfare of Hall, 99 Wn.2d 842, 851, 664

P.2d 1245 (1983). DSHS is not required to offer or provide services that would be futile. In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001).

Tolbert argues that "his alleged drug use ... may well have been cured sooner if mental health services were provided." Brief of Appellant at 10. But the record does not support Tolbert's speculation. Here, the trial court found that Tolbert "has significant substance abuse issues" and "his substance abuse issues have not been addressed" despite the fact that DSHS "offered substance abuse services repeatedly." Clerk's Papers (CP) at 26. The trial court also found that Tolbert was "essentially uninvolved" for the first year of C.E.T.'s life:

> Mr. Tolbert did not participate much when he was at the hospital, he did not engage in any of the services recommended by the Department, and at least for about the first year he did not show up for court. He did not even have contact with his family, including the family that was taking care of [C.E.T.]. By everyone's account, Mr. Tolbert checked out of the situation.

CP at 25. Tolbert does not challenge these findings and they are verities on appeal. In addition, Tolbert told Curtis that he refused to participate in urinalysis testing so that DSHS could not prove he was using drugs. It is clear that the primary barrier to reunification was Tolbert's use of methamphetamine. It is equally clear that Tolbert had no intention of participating in good faith in services to address his substance abuse. Consequently, DSHS was not required to offer still other services that might have been helpful.

In addition, Tolbert fails to challenge the trial court's finding that mental health services were not a necessary service for the purposes of RCW 13.34.180(1)(d). Specifically, the trial court found:

> As to the issue of mental health, the Court does believe that Mr. Tolbert does have mental health issues. Most people that have substance abuse issues have mental health issues. There is a lot of overlap. The issue was never identified as a needed service, and the Court is not finding that the mental health assessment or services were necessary. Although Mr. Tolbert is currently involved in mental health services, he still has not moved forward on the dependency action.

CP at 26. We accept as a verity the trial court's finding that mental health services would not have rectified Tolbert's parental deficiencies.

Tolbert's reliance on In re the Termination of S.J., 162 Wn. App. 873, 876, 256 P.3d 470 (2011) is misplaced. In S.J., the dependency court ordered the mother to participate in substance abuse and mental health services, but DSHS delayed referring the mother for mental health services until she was clean and sober. It took the mother nearly a year to successfully complete substance abuse treatment, and she contended that she would have been more successful had DSHS referred her to mental health services at the same time. But the mother in S.J. fully engaged in the services offered to her. Here, as the trial court found, Tolbert "checked out" of the dependency proceedings and was completely unresponsive to the efforts of DSHS and his family members to offer resources and support. It would have been futile to offer Tolbert additional services at the time, and DSHS was not obligated to do so.

Tolbert additionally claims that "the State critically failed to offer [him] anger management and housing services despite clear evidence he needed both." Brief of Appellant at 12. But the record contains no evidence for the claim that anger management services were "necessary" within the meaning of RCW 13.34.180(1)(d). Tolbert points to testimony that he argued with Freudenberg and was combative with medical staff at the hospital. But that evidence is insufficient to show that Tolbert had a

significant problem managing his anger, that anger management services would have been helpful, or that he would have participated in them had they been offered. Equally speculative is Tolbert's claim that homelessness was a barrier to reunification. The dependency court may order housing assistance only when "a parent's homelessness or lack of suitable housing is a significant factor delaying permanency for the child." RCW 13.34.138(4). While Tolbert moved around a great deal during the dependency proceedings, staying with various friends and relatives, there was no evidence that any of these housing options were inappropriate for C.E.T., had Tolbert addressed his substance abuse issues and been capable of caring for her. Even if Tolbert's housing instability was an issue in the case, it was certainly not the primary issue, which was Tolbert's substance abuse. Tolbert did not cite homelessness as a reason for failing to participate in the dependency proceedings, instead stating that he was frustrated with his social workers and focusing on his relationship with Freudenberg. Substantial evidence supports the trial court's conclusion that DSHS offered all necessary services.

Little Likelihood of Reunification

Tolbert argues the trial court erred in finding under RCW 13.34.180(1)(e) that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." The focus of this factor is "whether parental deficiencies have been corrected." T.R., 108 Wn. App. at 165 (quoting RCW 13.34.180(1)(e)). What constitutes the "near future" depends on the age of the child. In re Dependency of T.L.G., 126 Wn. App. 181, 204, 108 P.3d 156 (2005); see also P.A.D., 58 Wn. App. at 27 (1990) (six months is not in the "near future" of a 15 month old child).

Tolbert contends that he was employed and had a stable residence by the time of the termination trial, and that the trial court noted that he did not appear to currently be using drugs. He also presented evidence that he was loving and appropriate with C.E.T. on the occasions that he did visit. But the trial court found that Tolbert had not addressed his substance abuse issues or maintained a parental relationship with C.E.T. The trial court also found that Tolbert would be unavailable to parent C.E.T. as a result of the jail time he faced.

> [E]ven while on medication he was prescribed previously, he still has not completed the recommended substance abuse evaluation or the UA's or what the Court thinks he needs to do to become a father in this case. He still has not visited [C.E.T] on a consistent basis since Halloween, and it is now February, so the Court is not seeing any progress in that relationship.
>
> The Court informed Mr. Tolbert that his daughter's future is in a matter of months, not years. That she cannot look forward, she is not six or seven or ten. Her life, what's in the near future, is much different than what is in the near future for you. [C.E.T] needs to have a home where she feels secure. She has that now.
>
> The Court does not think at this point, given the issues that still need to be addressed, that Mr. Tolbert can provide the safety and security in a home at present. He has too many of his own issues to deal with. Mr. Tolbert's stability is tenuous at best . . . . He is newly married, he is not engaged in services, he has a few months in jail that still need to [be] addressed. The Court thinks by everybody's testimony, including the parenting evaluator, Mr. Tolbert has some work to do.

CP at 27. These unchallenged findings adequately support the trial court's conclusion that there was little likelihood that C.E.T. could be returned to Tolbert's care in the near future.

Continuation of the Parent-Child Relationship

Finally, Tolbert contends that the trial court erred in concluding that continuation of the parent-child relationship diminished C.E.T.'s prospects for early integration into a

stable and permanent home. But Tolbert's challenge to this conclusion is premised on his claim that he was capable of providing C.E.T. a stable and permanent home at the time of the termination trial. As discussed above, the trial court's conclusion to the contrary was supported by its unchallenged findings. Accordingly, the trial court did not err.

We affirm the trial court's order terminating Tolbert's parental rights to C.E.T.

WE CONCUR: