
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2017 FEB 27 AM 10: 36

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| In the Matter of the Dependency of:<br><br>E.N.M. (DOB: 1/23/14),<br><br>Minor Child.<br><br>BERTRAM MACKEY,<br><br>Appellant,<br><br>v.<br><br>STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES,<br><br>Respondent. | No. 75178-6-I<br>(consol. with No. 75179-4-I)<br><br>DIVISION ONE<br><br><br><br>UNPUBLISHED<br><br>FILED: <u>February 27, 2017</u> |

Cox, J. – Bertram Mackey appeals the order terminating his parental rights to his daughter E.M. He argues that the Department of Social and Health Services (Department) failed to offer or provide all reasonably available services capable of correcting his parental deficiencies within the foreseeable future. Because substantial evidence supports the trial court's relevant findings, we affirm.

Bertram Mackey and Andrea Thompson are the parents of E.M., who was born on January 23, 2014. E.M. has lived in the same licensed foster care home since birth. Mackey and Thompson, who have been homeless since E.M.'s birth,

are engaged to be married. At the time of the termination trial in March 2016, Mackey was living in a shelter that did not permit children and had made no meaningful progress in obtaining employment or stable housing suitable for a child.

During a contested dependency proceeding, the trial court determined that Thompson was incompetent and appointed a guardian ad litem to represent her interests. The court found E.M. dependent as to Thompson, concluding that her extreme mental illness would place E.M. in danger if she were returned to Thompson's care.

Dr. JoAnne Solchany diagnosed Thompson with "delusional disorder" and recommended that she engage in treatment. Thompson declined to participate in court-ordered treatment or acknowledge her mental health issues. The court ultimately terminated Thompson's parental rights.[1]

Mackey suffers from amnesia and cannot remember events occurring before October 2012. He entered into an agreed dependency order on May 19, 2014. The dispositional order required Mackey to complete a neuropsychological evaluation with a parenting component and provided for two supervised visits per week with E.M.

---

[1] The court's termination of Thompson's parental rights is not at issue in this appeal.

Mackey participated in a neuropsychological evaluation with Dr. Paul Connor in the fall of 2014. Dr. Connor found no evidence of a cognitive disorder that would prevent Mackey from successfully parenting his child. Dr. Connor recommended that Mackey participate in a psychological or psychiatric evaluation for possible personality disorders.

Dr. Dana Harmon conducted an extensive psychological evaluation in April and May 2015. Dr. Harmon characterized Mackey as initially extremely suspicious and guarded to the point of appearing "on the edge of being delusional . . . if not fully delusional." He diagnosed Mackey with "Conversion Disorder with Mixed Symptoms," a "cluster of unusual, rare symptoms that are often associated with emotional distress as opposed to genuine health problems." Dr. Harmon suspected that Mackey also suffered from paranoid personality disorder and anxiety disorder. Dr. Harmon was unable to complete definitive diagnoses because of Mackey's memory issues and the lack of medical records to support Mackey's self-reported medical history.

Dr. Harmon was particularly concerned about Mackey's unwillingness to recognize or deal with his own mental health issues. Mackey lacked "intrinsic motivation" and viewed his mental health issues "as purely medical and did not seem open to treatment except perhaps if it was part of a process of getting his daughter back."

Dr. Harmon also found Mackey's inability to acknowledge Thompson's severe confusion and mental health issues to be alarming. Despite the

overwhelming evidence, Mackey refused to acknowledge Thompson's mental illness, ascribing it to false accusations or a conspiracy.

Although he observed no major issues during one of Mackey's visit with E.M., Dr. Harmon concluded that Mackey was unable meet E.M.'s needs as the primary custodian:

> My judgment was that he is not able to—or at least he was not able to at the time I worked with him given all the multiple demands of parenting and working with people in the community and medical providers and managing the situation with [Thompson]. It seemed [inaudible] past what he was able to do at that point.[2]

Dr. Harmon recommended that Mackey receive psychiatric treatment and therapy, a psychiatric medication evaluation, and family therapy. He believed that a community health center could provide such services, but suggested that the services would be most effective if Mackey worked with a psychiatrist rather than a master's level clinician. At the termination trial, Dr. Harmon testified that Mackey had a poor prognosis for progress through treatment because of his lack of insight into his own deficiencies and his inability to recognize the risk that Thompson's mental health issues posed to E.M.'s safety.

Initially, treatment providers refused to accept Mackey because he denied having any mental health issues. The Department eventually identified Community Psychiatric Clinic (CPC) as a possible resource. CPC rejected Mackey after he denied needing treatment. After the Department social worker

---

[2] Report of Proceedings (March 23, 2016) at 259.

intervened, however, CPC accepted Mackey. In November 2015, Mackey began mental health therapy with Britt Alvy. Alvy, who has a master's degree in social work, is a "licensed independent clinical social work associate" who works under the supervision of a licensed mental health professional.

In December 2015, Mackey participated in a psychiatric evaluation with Dr. Carrie Sylvester at CPC. Dr. Sylvester diagnosed Mackey with dissociative amnesia and mild cognitive impairment. Dr. Sylvester determined that Mackey did not need medication and recommended that he continue therapy with Alvy.

Alvy developed a treatment plan to assist Mackey in gaining insight into, among other things, his mental health issues. The goals of the treatment plan included trust- and relationship-building. By the time of the termination trial, Mackey had completed nine therapy sessions. Alvy found that although Mackey currently might have some understanding that others were concerned about Thompson's delusional and extreme behavior, he did not find her behavior concerning. Alvy was still in the initial stages of building a therapeutic relationship with Mackey and was unable to predict how long she would need to complete Mackey's treatment. She believed a minimum of several more months were necessary.

Marissa Camp, the Department's social worker assigned to E.M., testified that Thompson's untreated mental health issues impaired her ability to make safe and appropriate decisions involving E.M.'s care. In Camp's meetings with Mackey, he characterized Thompson's behavior as "weird," but attributed it

primarily to stress. Mackey did not believe Thompson had mental health deficiencies and he intended to continue his relationship with her. Camp expressed great concern that Mackey would be unable to recognize Thompson's unsafe behavior or to protect E.M. if necessary. Camp was unaware of any services that could change Mackey's current views about Thompson's ability to safely parent E.M.

Camp was also concerned about Mackey's untreated mental health issues and parenting abilities. She stressed that Mackey could not even begin to address his parenting skills until his mental health issues were stabilized. Dr. Harmon's evaluation indicated that Mackey would need to have stable mental health for at least six months before he would benefit from a parenting class or coaching. Camp concluded that Mackey would be unable to overcome his parental deficiencies anytime soon:

> I believe that he intends to go—or he intends to remain in a relationship with Ms. Thompson. I don't believe that that relationship will end. I believe that that relationship in and of itself is detrimental to [E.M.'s] health, safety, and welfare. I think he has untreated or unmanaged mental health needs that he has little, if any, insight into that affects his day-to-day functioning.[3]

Mackey testified that he had been in a relationship with Thompson for three years. He maintained that he had never observed her experience delusions, but thought it was "possible." Mackey initially testified that he would

---

³ Report of Proceedings (March 21, 2016) at 105.

have no concerns about Thompson providing unsupervised care for E.M. He later testified that he was "surprise[d]" about some of the information he learned at trial and was beginning to understand some of the concerns that others had about Thompson. But Mackey acknowledged that he still planned to marry Thompson and denied that he had "mental health issues that need to be worked on."

The evidence was undisputed that Mackey's weekly visits with E.M. were generally appropriate, although he sometimes failed to engage with E.M. as a parent and brought appropriate supplies and snacks only to a small percentage of the visits. Carolyn Frimpter, E.M.'s guardian ad litem, observed no parental deficiencies and found Mackey to be "warm and engaging with [E.M.]" Frimpter was concerned, however, by Mackey's refusal, despite encouragement, to exercise his right to visit E.M. twice each week. Mackey claimed that his failure to take advantage of a second weekly visit was the result of "miscommunication."

The trial court found that the Department had satisfied its burden and terminated Mackey's parental rights. The court found clear, cogent, and convincing evidence that the Department had offered Mackey all necessary services, reasonably available, capable of correcting his parental deficiencies within the foreseeable future. In particular, the court found that Mackey's treatment at CPC with Alvy was appropriate and as effective as possible under the circumstances.

Mackey appeals.

Termination of Parent-Child Relationship

"Parents have a fundamental liberty and property interest in the care and custody of their children."[4] Before terminating parental rights, Washington courts must follow a two-step process. First, the Department must prove the following six statutory requirements by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[5]

---

[4] In re Welfare of K.J.B., No. 91921-6, slip op. at 5 (2017) (citing U.S. CONST. amends. V, XIV; WASH. CONST. art. I, § 3; Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

[5] RCW 13.34.180(1); see also In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010); RCW 13.34.190.

Second, if the Department proves the six termination factors, the court then determines, by a preponderance of the evidence, if termination is in the child's best interests.[6]

When the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the court's findings of fact and whether those findings support the court's conclusions of law.[7] Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable.[8]

## RCW 13.34.180(1)(d)

On appeal, Mackey challenges only the trial court's finding under RCW 13.34.180(1)(d) that the Department offered or provided all reasonably available services capable of correcting his parental deficiencies. He argues that the court-ordered treatment provided through CPC was inadequate because the therapist had only a master's degree.

Mackey's arguments rely primarily on the testimony of Dr. Harmon, who evaluated Mackey in April and May 2015. During his trial testimony, Dr. Harmon expressed a "concern" about the training and skill of "people in places like CPC" to treat severe mental illness. He explained that "my sense is that Mr. Mackey

---

[6] RCW 13.34.190(1)(iv)(b).

[7] In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990).

[8] In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

perhaps is beyond the skill level of most of the clinicians at a place like CPC" and that he would have more confidence in the judgment of a psychiatrist.

Mackey maintains that had the Department provided mental health services by a "qualified professional," he would likely have gained insight into the consequences of Thompson's mental illness and into his own mental health issues. Such insight, in turn, would have been a major factor in correcting his parental deficiencies.

But Dr. Harmon's trial testimony must be viewed in context. His general comment about having more confidence in the judgment of a psychiatrist was made during cross examination after hearing that the CPC therapist had not made a particular diagnosis. Dr. Harmon acknowledged that a community-based facility could provide appropriate treatment for Mackey. Dr. Harmon did not review Alvy's qualifications or her specific treatment goals and the therapy that she was providing to Mackey. Nor did he criticize Mackey's treatment at CPC as inadequate or identify any specific alternative treatment capable of rectifying Mackey's parental deficiencies within the foreseeable future. Dr. Harmon acknowledged that Mackey's prognosis for treatment was poor.

Moreover, consistent with Dr. Harmon's evaluation, Dr. Sylvester, a psychiatrist, conducted a psychiatric and medication evaluation at CPC in December 2015. She diagnosed Mackey with dissociative amnesia and determined that he did not need psychiatric medication. Based on her

evaluation, Dr. Sylvester recommended that Mackey continue his therapy with Alvy.

Mackey asserts that Dr. Sylvester's evaluation is not persuasive because she spent only a few hours with him and did not testify to explain the basis for her diagnosis. But these contentions involve credibility determinations that this court cannot review. An appellate court defers to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.[9] Such deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her."[10]

Despite overwhelming evidence and the Department's ongoing efforts, Mackey steadfastly refused to acknowledge the parental risks associated with Thompson's mental illness or his own mental health issues.[11] Substantial evidence supported the trial court's findings that Alvy's treatment was as effective as possible under the circumstances and that the Department provided all

---

[9] State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

[10] In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

[11] See In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001) ("When a parent is unwilling or unable to make use of the services provided, [the Department] is not required to offer still other services that might have been helpful.").

necessary services capable of correcting Mackey's parental deficiencies within the foreseeable future.

We affirm the order terminating Mackey's parental rights.

_____
Cox, J.

WE CONCUR:

_____
Trickey, A.J.

_____
Schindler, J.