[Nos. 23671-7-I; 23726-8-I. Division One. April 23, 1990.]

*In the Matter of the Dependency of* P.D.

SANDRA DAVIS, *Appellant,* v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent.*

PAUL DAVIS, SR., *Appellant,* v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent.*

*Eric Broman* of *Washington Appellate Defender Association,* for appellant Sandra Davis.

*Matthew Elich* and *Michael Lipscomb,* for appellant Paul Davis, Sr.

*Kenneth O. Eikenberry, Attorney General,* and *Dale T. Wagner, Assistant,* for respondent.

*Denise Brennan,* as guardian ad litem for the child.

SCHOLFIELD, J.—Sandra Davis and Paul Davis, Sr., appeal the trial court order terminating the parent–child relationship between them and their son, P.D. We affirm.

## FACTS

P.D. was born on August 30, 1987. At the time of his birth, his mother, Sandra Davis, was an inpatient at Western State Hospital, under an involuntary commitment.

A dependency petition was filed on September 2, 1987, alleging that Sandra was a diagnosed schizophrenic who currently resided at Western State Hospital, and who was unable to meet her own basic needs for food, clothing, and shelter. The petition also noted that Sandra received high doses of the drug prolixin during her pregnancy due to lack of awareness that she was pregnant. This fact, along with no prenatal care, cigarette smoking, and poor nutrition made it highly likely that the child would experience developmental delays and possibly be retarded.

The petition further alleged that Paul and Sandra Davis had neglected and abused another child, and that after provision of extensive services to the family, the parent–child relationships were terminated. Finally, the petition alleged that attempts were made both by mental health and medical professionals to engage Paul in making appropriate plans for the birth of the child, but that he had failed to do so.

The juvenile court authorized shelter care on September 2, 1987, and P.D. was placed in foster care, where he remained at all times prior to the termination hearing. Sandra was released from Western State Hospital back into the community on a less restrictive commitment on September 14, 1987. A dependency order was entered on November 6, 1987.

The dependency disposition order required Sandra to comply with mental health treatment services established for her, and to complete an anger management class, and provided for weekly supervised visits as long as she continued her medication. The disposition order required Paul to complete a parenting class and an anger management class, required him to undergo a psychological evaluation, and provided for supervised contact with P.D. five times per week.

Subsequent to the entry of the dispositional plan, Sandra was involuntarily committed to Western State Hospital on the basis of grave disability. She continued to reside there throughout the period of dependency. At the time of the termination hearing, a release to a less restrictive facility was being contemplated for her.

During the period of dependency (November 1987 to December 1988), the State arranged to have P.D. transported from Bellingham to Western State Hospital seven times for visitation with Sandra. The visits were scheduled to last 1 hour, but Sandra often terminated the visits after 20 minutes because she might miss her lunch. Dr. Larry Arnholt, Sandra's psychologist at Western State Hospital, testified that the services provided to Sandra at Western State Hospital were a structured environment and consistent supervision of medication.

Merrie O'Meara, the Department of Social and Health Services (DSHS) caseworker, testified that no other services were provided to Sandra once she returned to Western State Hospital because they were not deemed appropriate for her under the circumstances. O'Meara noted that at one point visitation with P.D. was suspended on the advice of

Sandra's treating physician because Sandra was "so volatile".

Arnholt testified further that the prognosis for someone with a long history of mental illness like Sandra was "guarded". He stated that Sandra's recent progress only meant that she could be moved to a less restrictive facility, not that she was cured from her grave disability. Arnholt acknowledged that parenting classes and increased visitation would tend to accelerate any improvement Sandra might make in the parenting area. However, he testified that he did not anticipate that Sandra would be able to perform the role of caretaker in the near future.

In addition to testimony regarding Sandra's present parenting abilities, the State presented evidence concerning the dependency and eventual termination of the parent–child relationship of the Davises' older child, N.D. The testimony showed that N.D. was born on September 1, 1975, and dependency was established on December 30, 1980.

At the time of the dependency, N.D. appeared to be very frightened and bedraggled. She had no experience eating at a table, a lack of bathing and hygiene skills, and a lack of normal interaction with peers. N.D. was later found to be suffering from post–traumatic stress syndrome, for which she was hospitalized. During the period of N.D.'s dependency, Sandra spent virtually all of the time as an involuntarily committed patient at Western State Hospital. The DSHS caseworker was repeatedly told that no release date for Sandra had been planned, and that it was realistic only to focus on Sandra's own treatment, not on her parenting skills.

In the early stages of the dependency, Paul retained custody of N.D. DSHS provided the family with day care, homemaker services, individual counseling, marital counseling, counseling for N.D., and a parenting class. After 1 year, N.D. was placed in foster care. At that time, the caseworker felt that Paul had great difficulty in providing the basic needs of food, clothing, and shelter for N.D., and in

understanding why these needs must be met. The case-worker believed that Paul appeared to be at a loss as to how to entertain, stimulate, and nurture a little girl. He appeared to have no understanding of community standards concerning his own hygiene.

While N.D. was in foster care, Paul attended another parenting class. His attendance was excellent, but the instructor felt that Paul did not have the ability to generalize the concepts learned in the class. During this period of time, Paul began to miss scheduled visitations. N.D. became withdrawn as time went on, and Paul missed more visits, until the child ultimately tried to avoid the visits. Following a police report concerning Paul's bizarre behavior of jumping out at people on the street and making "karate-type" gestures while N.D. was with him, the caseworker filed a petition for termination. The petition was granted as to both Sandra and Paul on October 3, 1984.

The State provided a wide variety of services to Paul during P.D.'s dependency. He attended two different parenting classes along with a parent–child class. The caseworker suggested that Paul obtain counseling. He first went to a private therapist, then to a counseling clinic. Other services provided to Paul to help him with his parental deficiencies included public health services, homemaker services, day–care services, and therapeutic child care. He also received an anger control evaluation and a psychological evaluation. Extensive visitation was provided, consisting of 10 hours per week of supervised visitation in Paul's home. The DSHS caseworker also arranged transportation for the child to and from Paul's home.

The State presented testimony that, despite the wide array of services offered to Paul, he had not made significant progress in upgrading his parenting skills. The public health nurse and several persons who had supervised the visits testified that Paul seemed unable to understand what the baby's needs were and unable to understand the child's cues as to basic needs. Paul apparently was able to follow specific instructions, but could not generalize when left on

his own in areas such as feeding. Although many of the errors were minor, the overall effect was that Paul showed a lack of understanding of the child's needs.

The psychologist who evaluated Paul indicated that he was unlikely to perceive the needs of a child or to follow through with treatment for the child. Caseworker testimony indicated that Paul would not be able to attend to the basic care needs of an average child on a full–time basis.

The State also presented testimony showing that P.D. is a "special needs" child. He has physical/neuromuscular delays, crossed eyes, nocturnal static encephalopathy (cerebral palsy), and cognitive delays. Further testimony indicated that managing P.D's need for special services would require an organized and sophisticated parent. In addition, the psychologist testified that it was in the child's best interests to resolve the issue of who would be his permanent caretaker.

On February 2, 1989, the trial court terminated Sandra's and Paul's parental rights to P.D. This appeal timely followed.

### SANDRA DAVIS
### CAUSE 23671–7–I
### Provision of All Necessary Services

■ RCW 13.34.180 states in part as follows:

A petition seeking termination of a parent and child relationship may be filed in juvenile court by any party to the dependency proceedings concerning that child. Such petition shall conform to the requirements of RCW 13.34.040 and shall allege:

(1) That the child has been found to be a dependent child under RCW 13.34.030(2); and

(2) That the court has entered a dispositional order pursuant to RCW 13.34.130; and

(3) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency under RCW 13.34.030(2); and

(4) That the services ordered under RCW 13.34.130 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided; and

(5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and

(6) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home;

RCW 13.34.190 states as follows:

After hearings pursuant to RCW 13.34.110, the court may enter an order terminating all parental rights to a child if the court finds that:

(1) (a) The allegations contained in the petition as provided in RCW 13.34.180 (1) through (6) are established by clear, cogent, and convincing evidence; or (b) RCW 13.34.180(3) may be waived because the allegations under RCW 13.34.180 (1), (2), (4), (5), and (6) are established beyond a reasonable doubt; . . . and

(2) Such an order is in the best interests of the child.

Sandra's brief disputes the trial court's findings with respect to RCW 13.34.180(4). Where the trial court has weighed the evidence, review is limited to ascertaining whether the findings of fact are supported by substantial evidence, and if so, whether the findings support the conclusions of law and the judgment. *Morgan v. Prudential Ins. Co. of Am.*, 86 Wn.2d 432, 545 P.2d 1193 (1976).

Findings of fact will not be disturbed if supported by substantial evidence. However, the determination must be made in light of the degree of proof required. If the proof required is clear and convincing, then the question on appeal is whether there is substantial evidence to support the findings in light of the highly probable test. *In re Sego*, 82 Wn.2d 736, 513 P.2d 831 (1973).

In order to comply with the requirements of RCW 13.34-.180(4), the State must affirmatively offer or provide the necessary services. *In re Hall*, 99 Wn.2d 842, 664 P.2d 1245 (1983). With respect to the question of the services provided to Sandra by the State, the trial court's finding was as follows:

The services offered to Sandra Davis during the course of this dependency have included mental health treatment services at Western State Hospital and supervised visitation with the child at the hospital. The supervised visits in general have

appeared not to go well. Ms. Davis has demonstrated a certain awkwardness with the child and has frequently terminated visits early because of perceived conflicts with her scheduled lunch.

Finding of fact 21.

Sandra argues that the State failed to provide her with parenting classes and anger management evaluations. She points to testimony from both her doctor at Western State and her former mental health worker that such services could have aided her to become an adequate parent. Sandra argues that the State's caseworkers decided early on in the dependency that she could never be an adequate parent, and acted accordingly.

The State responds that there was uncontroverted expert testimony that Sandra's grave disability, which resulted in her involuntary commitments, was such that she was unable to care for herself, let alone care for others. According to the State, services other than those dealing with Sandra's schizophrenia would have been inappropriate. Furthermore, the State points to testimony that Sandra did not consistently follow her medication requirements, and her emotional state was often volatile while at Western State Hospital.

In *In re Ramquist,* 52 Wn. App. 854, 765 P.2d 30 (1988), *review denied,* 112 Wn.2d 1006 (1989), the parent–child relationship was terminated as to a child and his mother, who had been diagnosed as a chronic schizophrenic. In analyzing whether the agency petitioning for termination had offered all reasonable services, the *Ramquist* court noted that "a parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful." *Ramquist,* at 861.

Applying that rationale to the facts before us, we hold that the trial court correctly concluded that all reasonable and necessary services capable of correcting parental deficiencies were provided through Sandra's inpatient treatment at Western State Hospital. However, even if this

court were to decide that the State failed to provide necessary services to Sandra, there is sufficient evidence in the record from which the trial court could have determined that these services, even if provided, would not have corrected Sandra's parental deficiencies in the near future. *See In re Hall, supra* at 851.

The testimony from the mental health professionals indicated that Sandra had made sufficient progress to be considered for a less restrictive alternative placement in the near future. Such a placement, if successful,[1] would last at least 6 months. Only after that would any attempt be made for Sandra to live on her own, such that the possibility of her caring for her son could be considered. The trial court reasonably determined that in the life of a 15–month–old, this possibility was not in the near future.

### Evidence of Prior Termination

A trial court's determination that certain evidence is admissible will not be overturned on appeal absent a manifest abuse of discretion. *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). ER 404, Character Evidence Not Admissible To Prove Conduct; Exceptions; Other Crimes, reads in pertinent part:

> **(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Although ER 404(b) usually is applied in the context of criminal cases, there is no limiting language in the rule. It may be applied under appropriate circumstances in a civil case as well. *See* 5 K. Tegland, Wash. Prac. § 114 (1989). Neither party cites a case applying an ER 404(b) analysis to evidence of a prior termination of parental rights in a present termination proceeding.

---

[1]Over the years, several of Sandra's less restrictive alternative placements had been revoked due to her inability to function outside the hospital setting.

However, in a pre–rule case, *In re Ross,* 45 Wn.2d 654, 277 P.2d 335 (1954), the Washington Supreme Court stated as follows:

> On the issue of whether a father or mother is to be permanently deprived of parental rights, the entire record of the parenthood is open to investigation and inquiry. Remote happenings are perhaps entitled to little weight, but the juvenile court is entitled to the entire story before it acts.

*Ross,* at 657. The Washington Court of Appeals subsequently applied the *Ross* language to a circumstance in which a dependent child's older sibling had been beaten to death by their parent in *In re Bennett,* 24 Wn. App. 398, 600 P.2d 1308 (1979).

Similarly, in *In re Frederiksen,* 25 Wn. App. 726, 610 P.2d 371 (1979), *review denied,* 94 Wn.2d 1002 (1980), a mother who was a diagnosed schizophrenic challenged *inter alia* a finding that her infant daughter, who was placed in foster care at birth, was a dependent child. The appeal also concerned termination orders severing the parent–child relationships between the mother and her two older children. In analyzing whether the dependency of the infant had been adequately proven, the *Frederiksen* court noted that the evidence showed that the mother had already damaged her two older children by neglect and failure to meet their physical, mental and emotional needs. *Frederiksen,* at 733.[2]

Thus, although Washington courts have not yet addressed the question of admissibility of such evidence under ER 404(b), they have definitely found such evidence relevant. We reject Sandra's ER 404(b) argument.

In a termination proceeding, the ultimate issue for the court is not whether a particular set of alleged facts has been proven, but whether the natural parents of a child can best meet that child's needs in the future. Thus, the circumstances that ER 404(b) seeks to prevent are not applicable in a termination hearing. An analogous type of

---

[2]In *Frederiksen,* the appellate court implicitly held that evidence regarding the older children was admissible in the dependency.

hearing is one to determine a criminal defendant's "future dangerousness" for sentencing purposes. In such instances, the trial court may examine a defendant's past history to make such a determination. *See State v. Payne*, 45 Wn. App. 528, 726 P.2d 997 (1986).

## Equal Protection

The equal protection clauses of the Fourteenth Amendment and Const. art. 1, § 12 mandate that ""'persons similarly situated with respect to the legitimate purpose of the law receive like treatment."'" *State v. Schaaf*, 109 Wn.2d 1, 17, 743 P.2d 240 (1987) (quoting *State v. Phelan*, 100 Wn.2d 508, 512, 671 P.2d 1212 (1983)). Three tests have been used to determine whether equal protection has been violated. Under the rational relationship test, a law is subject to minimal scrutiny, and will be upheld ""'Unless it rests on grounds wholly irrelevant to the achievement of a legitimate state objective."'" *Schaaf*, at 17 (quoting *State v. Phelan, supra* at 512). The strict scrutiny test is used if an allegedly discriminatory classification affects a suspect class or a fundamental right. Under strict scrutiny, a law must be necessary to accomplish a compelling state interest. Under some circumstances an "intermediate scrutiny" test is applied, and a challenged law must be shown to further a substantial state interest. *Schaaf*, at 17–18.

The State concedes that as parents facing termination of their parental rights, the Davises were similarly situated and entitled to equal protection under the law. The next step in an equal protection analysis is to show that equal protection was denied to an individual.

■ Sandra's arguments on this issue fail to make such a showing. RCW 13.34.180(4) requires the State to provide "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future . . .." Obviously, the necessary services will vary from individual parent to individual parent, and so the State argues in its brief. Given that the services offered must be tailored to the individual, Sandra has failed to

show that she received unequal treatment. Because her brief has failed to make the threshold showing, this court need not consider whether any State purpose was served by disparate treatment.

Finding no colorable claim of error by Sandra, we hold that the trial court properly terminated her parental rights as to P.D.

PAUL DAVIS
CAUSE 23726–8–I
Provision of All Necessary Services

■ According to the trial court's findings of fact, the following services were offered:

> Mr. Davis has been offered a variety of services during this dependency including parenting classes, public health nurse services, homemaker services, an anger control evaluation, a psychological evaluation and extensive visitation. Visitation was initially established at five times per week and subsequently reduced to three times per week and then twice per week. Throughout the dependency visitation has been offered in a total amount of approximately ten (10) hours per week.

Finding of fact 26.

> Mr. Davis was also encouraged to receive individual counseling to help deal with difficulties relating to his Vietnam service and Mr. Davis has recently begun such counseling. . . .

Finding of fact 27.

> Mr. Davis was previously offered a variety of services throughout the almost four year period of time that [N.D.] was a dependent child. . . .

Finding of fact 28. Paul assigns no error to any of the trial court's findings of fact. Therefore, these findings are verities on appeal. *Sherwood v. Bellevue Dodge, Inc.*, 35 Wn. App. 741, 669 P.2d 1258, 676 P.2d 557 (1983).

Paul argues that the Department should have offered structured visits for himself, Sandra, and P.D., to enable the family to correct its deficiencies. However, the State notes that joint visitation was tried but discontinued because of the arguing that went on between Paul and Sandra during the visits. In addition, the record indicates that Paul had filed for a divorce prior to the termination

hearing. Therefore, joint visitation would not have been reasonable.

The trial court concluded that the long list of services provided to Paul for 15 months in this dependency and for several years in the previous dependency, to correct his parental deficiencies, were all the reasonable and necessary services capable of correcting those deficiencies. In the absence of cogent argument regarding some service that was not provided, we affirm the trial court on this issue.

### RETURN OF THE CHILD TO THE HOME
### IN THE NEAR FUTURE

The trial court's findings regarding Paul indicated that he had received a multitude of services over the period of several years, first with the dependency of N.D., and then the dependency of P.D. Finding of fact 28 states in pertinent part:

> [Mr. Davis is] simply unable to provide minimally adequate parenting care to a child who is now fifteen (15) months of age. Many of the individual errors in parenting care which have been described are minor and some are even trivial. What is important, however, is that the overall perspective shows a lack of understanding of the needs of the child. . . .

Finding of fact 29 states in pertinent part:

> While [Mr. Davis] can follow specific instructions, he apparently is unable to transfer general instruction from a parenting class to a different setting or to deviate from instructions when appropriate even in such basic areas as feeding.

Finally, finding of fact 34 states as follows:

> The Court finds most disturbing [Mr. Davis'] view that he has been a responsible and adequate parent. [Mr. Davis] also insists that whatever problems described by the public health nurse or [Sandra's mental health worker] were caused by the actions of his wife. This is important because it demonstrates [Mr. Davis'] lack of understanding of his role as a parent and the needs of this child.

The essence of these findings of fact is that even after lengthy, intensive, parenting training, Paul appears unable to comprehend basic needs for his child and properly attend to them. Given this assessment of Paul's parenting abilities, it is clear that the trial court's conclusion that

there is little likelihood that Paul's parenting deficiencies could be remedied in the near future was supported by the findings.

Finding no trial court error concerning the termination of Paul's parental rights in P.D., we also affirm the trial court's order as to Paul.

WEBSTER and PEKELIS, JJ., concur.

Reconsideration denied May 23, 1990.

Review denied at 115 Wn.2d 1019 (1990).