

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

|  |  |
|---|---|
| In the Matter of the Dependency of ) | No. 78142-1-I |
| ) | consolidated with |
| S.D.M., dob 6/25/07, ) | No. 78143-0-I |
| J.M., dob 12/20/12, ) |  |
| ) |  |
| Minor Children. ) |  |
| ) |  |
| WASHINGTON STATE DEPARTMENT ) | |
| OF SOCIAL & HEALTH SERVICES, ) | |
| ) |  |
| Respondent, ) |  |
| ) |  |
| v. ) |  |
| ) | UNPUBLISHED OPINION |
| ALEXANDRA PEDREGON, ) |  |
| ) | FILED: November 13, 2018 |
| Appellant. ) |  |
| ) |  |

VERELLEN, J. — Alexandra Pedregon appeals from the trial court's order

terminating her parental rights to S.D.M. and J.M. The federal Indian Child

Welfare Act of 1978[1] (ICWA) and the Washington Indian Child Welfare Act[2]

(WICWA) are applicable to this case because both children are eligible for

enrollment in the Oglala Sioux tribe. Pedregon challenges the trial court's finding

that the Department of Social & Health Services (Department) made active efforts

---

[1] 25 U.S.C. §§ 1901-1963.

[2] Ch. 13.38 RCW.

to provide remedial services.[3] She also challenges the court's finding that her continued custody would likely result in serious emotional or physical damage to S.D.M. and J.M. And she contends the court failed to adequately consider the incarcerated parent factors from RCW 13.34.180. We affirm.

## FACTS

Pedregon is the mother of S.D.M., born June 2007 and J.M., born December 2012. Both children are eligible for enrollment in the Oglala Sioux tribe.

Prior to June 2013, S.D.M. and J.M. lived in California with Pedregon. In June 2013, law enforcement arrested Pedregon and contacted the children's maternal grandmother, Jessica Martinez, to pick up the children within 24 hours. The Oglala Sioux tribe supported Martinez in obtaining third-party custody through the tribal court.

Between June 2013 and January 2014, S.D.M. and J.M. continued to reside with Martinez in Washington. For much of this time, Pedregon's exact whereabouts were unknown. On January 6, 2014, Lummi tribal police submitted a referral to the Department, alleging they were called to Martinez's home "all the time" for domestic violence.[3] The referral was assigned to a Child Protective Services (CPS) social worker for investigation. During the investigation, the social worker discovered Pedregon had recently contacted S.D.M. and J.M., in violation of an August 22, 2013 order from the Oglala Sioux tribal court and a November 11,

---

[3] Ex. 31F at 6.

2013 order from the Lummi tribal court prohibiting contact between Pedregon and the children.

On January 10, 2014, the Department filed dependency petitions for S.D.M. and J.M. The Oglala Sioux tribe intervened and asserted exclusive jurisdiction over the children. The trial court denied the tribe's motion to transfer jurisdiction.

In January 2014, Pedregon completed a mental health assessment with the community service office to receive unemployment benefits. She was diagnosed with "Adjustment Disorder with Anxiety, R/O Generalized Anxiety Disorder, Methamphetamine Dependency early full remission, Opiate Dependency early full remission, Alcohol dependency sustained remission."[4]

On March 27, 2014, the court found S.D.M. and J.M. were dependent as to their parents and their Indian custodian, Martinez. S.D.M. and J.M. were placed in foster homes in Whatcom County. The court ordered Pedregon to complete certain services. Pedregon appealed, and on February 13, 2015, this court reversed the dependency orders and "remanded to the trial court for further proceedings, including to address the Oglala Sioux Tribe's motions to transfer jurisdiction to the Tribal Court as to each of children."[5] The Oglala Sioux tribe declined jurisdiction.

---

[4] Ex. 31F at 3.

[5] In the Matter of the Dependency of S.D.M. & J.M., No. 71829-1-I/4 (consol. w/ Nos. 71920-3-I, 71921-1-I, 71922-0-I, 71923-8-I, 71924-6-I), February 13, 2015.

On May 21, 2015, the Department filed amended dependency petitions for S.D.M. and J.M. On August 20, 2015, the court again found S.D.M. and J.M. to be dependent. The court ordered Pedregon to complete the previously ordered services.

On November 9, 2015, September 9, 2016, and August 29, 2017, the court held dependency review hearings. On March 20, 2016, March 14, 2017, and January 23, 2018, the court held permanency planning hearings. At each hearing, the court found the Department had made reasonable efforts to provide services and that Pedregon was not compliant with services.

On April 12, 2017, the Department filed petitions for termination of the parent-child relationship. The termination trial occurred on January 30 and 31, 2018. The court heard testimony from (1) Anne Williams, the social worker for S.D.M. and J.M.; (2) Jeannie Trueblood, the designated Indian child welfare expert for the Oglala Sioux tribe; (3) Frederick Messmann, an Indian child welfare expert; and (4) Russ Osenbach, the guardian ad litem (GAL) for S.D.M. and J.M. The court also heard testimony from Dr. Jason Prinster concerning his evaluation of Pedregon.

On February 2, 2018, the court entered orders terminating the parent-child relationship.

Pedregon appeals.

4

## ANALYSIS

### I. Did the Department exert active efforts to reunite Pedregon with her children?

Pedregon contends the Department failed to exert active efforts to reunite her with her children.

Parents have a fundamental liberty interest in the "care, custody, and control" of their children.[6] To terminate parental rights, the State must prove the six statutory elements from RCW 13.34.180(1) by clear, cogent, and convincing evidence.

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[7]

---

[6] Matter of Adoption of T.A.W., 186 Wn.2d 828, 841, 383 P.3d 492 (2016) (quoting In re Pawling, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)).

[7] RCW 13.34.180.

When an Indian child is at issue, ICWA and WICWA "impose more exacting requirements than a typical termination proceeding."[8] ICWA requires

> [a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that *active efforts have been made to provide remedial services and rehabilitative programs* designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.[9]

WICWA imposes an identical requirement.[10] Under WICWA, "active efforts" means "timely and diligent efforts to provide or procure such services, including engaging the parent or parents or Indian custodian in reasonably available and culturally appropriate preventive, remedial, or rehabilitative services. This shall include those services offered by tribes and Indian organizations whenever possible."[11]

Although ICWA does not define "active efforts," the Bureau of Indian Affairs (BIA) issued guidance with legislative rule 25 C.F.R. § 23.2. Section 23.2 is consistent with WICWA's definition of active efforts and includes a requirement that active efforts "be tailored to the facts and circumstances of the case."

Here, the court found, "Since dependency was established, services ordered under RCW 13.34.130 have been offered or provided and all necessary services reasonably available and capable of correcting Ms. Pedregon's parental

---

[8] T.A.W., 186 Wn.2d at 841.

[9] 25 U.S.C.A. § 1912(d) (emphasis added).

[10] RCW 13.38.130(1).

[11] RCW 13.38.040(1)(a).

deficiencies within the foreseeable future have been offered or provided."[12] The court found the Department offered the services through local tribal agencies when possible to make the services culturally appropriate. The court also found "[t]he Department made consistent, steady, and active efforts to offer these services to the mother, including multiple in person meetings to discuss the service plan with Ms. Pedregon."[13]

We review a trial court's findings of fact for substantial evidence.[14] "If the proof required is clear and convincing, then the question on appeal is whether there is substantial evidence to support the findings in light of the highly probable test."[15]

Pedregon specifically argues the Department failed to exert active efforts because "the Department's provision of services largely consisted of providing referrals" and "did not tailor its delivery of referrals . . . to her specific mental health needs."[16]

On March 27, 2014, in the first dependency order, the court ordered the following services: (1) a substance abuse evaluation; (2) random urinalysis (UA) testing; (3) a psychological evaluation; (4) an anger management assessment;

---

[12] Clerk's Papers (CP) at 342 (Finding of Fact 2.12).

[13] Id. (Finding of Fact 2.14).

[14] Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.2d 369 (2003).

[15] In re Dependency of P.A.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990).

[16] Appellant's Br. at 17.

(5) a parenting instruction; (6) a mental health assessment; and (7) upon the decision to transition the child home, an in-home parenting program.

In June 2014, Pedregon completed a drug and alcohol assessment at Lummi Care. Pedregon reported using heroin, and her UA came back positive for amphetamines. Pedregon did not show up for a follow-up appointment.

In July 2014, Pedregon contacted CPS and requested inpatient treatment. CPS contacted Lummi Care, and the Lummi Care supervisor recommended Pedregon come to Lummi Care immediately "so that they can work on [her] in-patient treatment bed availability."[17] The supervisor submitted her recommendation to Pedregon, Pedregon's attorney, and the GAL. Pedregon did not follow up with the recommendation.

Also in July 2014, Pedregon completed a domestic violence and anger management evaluation at Lummi Behavioral Health. The evaluator recommended Pedregon engage in weekly treatment sessions for six months, with a reassessment at six months to determine progress. Pedregon did not follow up with the recommendation. Lummi Care and Lummi Behavioral Health are located on the Lummi Nation Reservation. "Lummi Behavioral Health has services for mental health that have a Native American component to be more culturally sensitive."[18]

---

[17] Ex. 31F at 3.

[18] Report of Proceedings (RP) (Jan. 30, 2018) at 108.

Between January 2014 and July 2014, Pedregon attended supervised visits with S.D.M. and J.M. at the CPS office. On July 17, 2014, during a supervised visit, Pedregon threatened the visit supervisor. Based on this incident, on July 22, 2014, the court suspended Pedregon's visitation.[19]

Between March 2014 and October 2014, Pedregon had an ongoing referral for random UAs at CSS Recovery. During that time, Pedregon missed 70 UAs. On April 14, 2014 and July 14, 2014, Pedregon tested positive for methamphetamines. On August 6, 2014, Pedregon tested positive for alcohol. In October 2014, CSS Recovery informed the Department Pedregon was no longer allowed to receive services due to her "abusive behaviors and outburst[s]" towards staff.[20]

In November 2014, Pedregon participated in a partial psychological evaluation with Dr. Jason Prinster. Dr. Prinster reported Pedregon "exhibited significant difficulty providing a clear timeline or coherent personal history."[21] He also reported Pedregon was resistant to the evaluation process: "Throughout the evaluation she repeatedly stated that she felt that a psychological evaluation was unneeded and inappropriate."[22] At the evaluation, Pedregon did not complete

---

[19] "Per court order, Ms. Pedregon must provide documentations and compliance with drug and alcohol treatment, UA's, and Anger Management treatment for 30 days prior to mother bringing a motion to the courts to reinstate visitations." Ex. 31F at 4.

[20] Ex. 31F at 4.

[21] Ex. 21 at 5.

[22] Ex. 21 at 8.

cognitive testing, psychological testing, or parenting-related testing. Additionally, Dr. Prinster was unable to conduct a parent/child observation due to Pedregon's suspended visitation.

Dr. Prinster found Pedregon was demonstrating symptoms consistent with persecutorial delusional disorder and borderline personality disorder. Dr. Prinster reported Pedregon was fixated on her belief in a conspiracy between CPS, law enforcement, and other federal and state agencies to deny her custody of her children.

Dr. Prinster recommended inpatient or intensive outpatient psychiatric treatment but opined it was unlikely Pedregon would make any significant improvements for some time due to the severity of her symptoms. Dr. Prinster also reported:

> [Pedregon] states she is unwilling to participate in any treatment, as she does not see it as being necessary or needed. Ms. Pedregon would likely view any interventions within the context of her persecutory or paranoid delusions. It is unlikely that Ms. Pedregon will voluntarily participate in any treatment, although psychiatric treatment and treatment focused on ensuring that she is not abusing substances would be a necessary first step. . . . She is clearly not amenable to service and treatment recommendations.[23]

After this court reversed the first dependency order and the Oglala Sioux tribe declined jurisdiction, the Department filed amended dependency petitions for S.D.M. and J.M. On August 20, 2015, the court again found the children dependent and ordered Pedregon to complete a new psychological evaluation but

---

23 Ex. 21 at 12.

released her of the requirement to participate in a separate mental health assessment.

At the permanency planning hearing on March 20, 2016, the court added the requirement that Pedregon "[p]articipate in mental health services (individual counseling and/or medication management) to address ongoing mental health concerns related to parenting reunification with a Department-approved provider" and "[f]ollow any recommendations of the counselor/physician regarding ongoing care."[24] And at the permanency planning hearing on March 14, 2017, the court added the requirement that Pedregon complete a psychiatric evaluation with a Department-approved provider.

At the termination trial, the court considered the testimony of Anne Williams. Williams was the social worker for S.D.M. and J.M. for the two years prior to the termination trial. Williams testified about the services required of Pedregon. She testified the Department communicated those services "verbally as well as given to [Pedregon] in a written document."[25]

> [T]here have been multiple documents over the course of the dependency. Each time there is a review hearing each of the services is outlined as well as how to go about getting the services. There have also been multiple service referral letters that have been sent to Ms. Pedregon. She has also been served while she has been incarcerated, which she was located at that point which was easier in a way to be able to serve her.[26]

---

[24] Ex. 31L at 12.

[25] RP (Jan. 30, 2018) at 42.

[26] Id. at 42-43.

Williams testified that she met Pedregon in court on two occasions to offer her services, and she met Pedregon while she was at Whatcom County Jail on two occasions. Williams also testified Pedregon was not receptive to services:

> On one occasion she threw the documents back at me and said that she wasn't even going to read them, that she didn't need to do anything, she didn't need to read the documents. Another occasion she, I gave her the service letter and she took the service letter but said that she was not going to be engaging in any services.[27]

Williams testified Pedregon was recommended services at Lummi because Pedregon "lived out there at Lummi, I wanted to make this as easy as possible for her."[28]

Williams testified the Department offered all available services to Pedregon that could have corrected her parental deficiencies. She also testified the Department made continuous efforts to engage Pedregon in services, including continuing to send service referral letters, phone calls, and e-mails. The service referral letters "outlin[ed] each of the services that has been required of [Pedregon] as well as how she can go about getting those completed."[29]

Williams testified she sent Pedregon "information about how to go about applying for housing, how to sign up in our Section 8 housing, also included in that

---

[27] Id. at 43-44.

[28] Id. at 44.

[29] Id. at 53.

was the individual who assisted with housing out in Lummi."[30] She also testified she offered bus passes to Pedregon.[31]

Williams testified that neither S.D.M. nor J.M. was placed in a Native American home and that she attempted to find a relative or native placement.

Williams also testified about S.D.M.'s increased behavioral and emotional needs. S.D.M. was placed at Ryther Children's Center for a year and a half to address her emotional and psychological trauma. Williams testified about S.D.M.'s need for therapy "in order to have her be emotionally stable enough to transition to a lower level behavioral rehabilitation home."[32] She testified J.M. was currently in a permanent placement and S.D.M. was currently in a potentially permanent placement.[33]

The court also considered testimony from Jeanne Trueblood, the designated Indian child welfare expert from the Oglala Sioux tribe. Trueblood opined the Department actively worked with Pedregon to engage her in the court ordered remedial services. Trueblood testified that although the Oglala Sioux tribe does not usually support termination, she opined termination was appropriate "because there have been active efforts to find these children a relative placement,

---

[30] Id. at 79.
[31] Id.
[32] Id. at 47.
[33] Id. at 63.

there have been active efforts to find these children a native placement and neither of those did come through."[34]

In addition to Trueblood's expert testimony, the court considered expert testimony from Frederick Messmann. Messmann was the designated ICWA expert provided by the Department. Messmann opined the State had made active efforts to offer services and correct Pedregon's parental deficiencies. He recognized the case presented a unique challenge because Pedregon was resistant to services. During direct examination, Messmann testified about active efforts:

> [T]he way I interpreted active efforts is to help a parent engage in services, not just to simply make a referral, but also to help them engage in that service. That often can include things like offering bus passes or seeing if there is culturally relevant service that would be better suited to an individual.
>
> . . . .
>
> So often times in this local area it means instead of maybe referring to a service in Bellingham but rather a culturally more sensitive possibly service in Lummi, which can help identify things like, a service would be active or—so Lummi Care has services for drug and alcohol treatment, Lummi Behavioral Health has services for mental health that have a Native American component to be more culturally sensitive.[35]

As to a potential placement with a Native American family or tribe-affiliated family, Messmann testified:

---

[34] Id. at 97.

[35] Id. at 108.

> From my review the Oglala Sioux Nation has been an active part of the conversations regarding placement, whether that's been through FTDM's or e-mails concerning placement and placement options, and so they have been actively a part of trying to locate family members. When members have been presented to the Department it appears that the worker did attempt to ascertain the validity and options available for that placement.[36]

Finally, the court considered the testimony of Russ Osenbach. Osenbach was the GAL for S.D.M. and J.M. for four years prior to the termination trial. Osenbach testified that he met Pedregon on about 20 different occasions. He testified the conversations were usually unproductive:

> They normally turn into yelling matches or her yelling at me, accusing me of stealing her children, telling me I better return them right away or trouble is going to be made, telling me that I'm prejudiced to Lummi, I don't understand the Oglala Sioux ways, telling me that the State illegally took the kids from her because she wasn't present when the kids were taken from her mother. In short she blames anybody and everybody and when I would attempt to try to get her to start engaging or at least agree to engage in a service, she would just start yelling and ranting again.[37]

Osenbach testified the Department was offering Pedregon "highly appropriate services."[38] He also testified that the Department offered all the services that could have helped Pedregon address her parental deficiencies.

Osenbach opined termination was in the best interests of S.D.M. and J.M. because

---

[36] Id. at 112.

[37] Id. at 121.

[38] Id. at 122.

[Pedregon] is not engaged in any services that would alleviate her parental deficiencies, the psychological evaluation that was done in 2015 is very clear in that unless she engaged in all of the services that were recommended within that psychological evaluation, which then the court has ordered her to do, and consistently stay engaged and work on her issues, that it was a very poor prognosis as far as being able to have her children returned to them and be safely parented by her and not be harmed.[39]

Substantial evidence supports the trial court's findings regarding active efforts. The Department conducted a comprehensive assessment of S.D.M. and J.M.'s family, focused on reunification.[40] The Department was aware of the history of domestic violence involving Martinez and Pedregon. The Department was also aware of Pedregon's mental health issues and substance abuse problems. The court ordered appropriate services to address these issues, including substance abuse treatment, a psychological evaluation, and an anger management assessment.[41] After dependency was established and Dr. Prinster diagnosed Pedregon with persecutorial delusional disorder and borderline personality disorder, the court imposed additional requirements aimed at addressing Pedregon's mental health issues, including individual counseling and a psychiatric evaluation.[42]

---

[39] Id. at 134.

[40] See 25 C.F.R. § 23.2(1) (Active efforts include "[c]onducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal.").

[41] See 25 C.F.R. § 23.2(2) (Active efforts include "[i]dentifying appropriate services.").

[42] See 25 C.F.R. § 23.2(10) (Active efforts include "[c]onsidering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available.").

The Department went further than simply providing service referrals to Pedregon. The Department actively assisted her in obtaining the required services through detailed letters with step-by-step instructions.[43] The social worker and GAL also attempted to assist Pedregon in person on multiple occasions. Further, the Department illustrated its willingness to assist Pedregon in obtaining services with its prompt follow through on Pedregon's request for in patient substance abuse treatment. The Department also offered Pedregon housing and transportation support.[44] And the court held several dependency review and permanency planning hearings to monitor Pedregon's participation and progress in services.[45]

The Department also asserted active efforts to involve the Oglala Sioux tribe in the case.[46] The Oglala Sioux tribe conducted a diligent search for a relative placement.[47] When this search was unsuccessful, the tribe supported

---

[43] See 25 C.F.R. § 23.2(2) ("[H]elping the parents to overcome barriers, including actively assisting the parents in obtaining such services.").

[44] See 25 C.F.R. § 23.2(8) ("Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources.").

[45] See 25 C.F.R. § 23.2(9) ("Monitoring progress and participation in services.").

[46] See 25 C.F.R. § 23.2(3) ("Identifying, notifying, and inviting representatives of the Indian child's tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues.").

[47] See 25 C.F.R. § 23.2(4) ("Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and

termination. The Department was unable to offer Pedregon services through the Oglala Sioux tribe because the tribe is based in South Dakota. But the Department offered services through the local Lummi tribe.[48] Pedregon was originally amenable to these services. She participated in a drug and alcohol assessment at Lummi Care and a domestic violence evaluation at Lummi Behavioral Health.

Although S.D.M. and J.M. were in separate foster home placements, it appears this was appropriate in light of S.D.M.'s advanced behavioral and emotional needs.[49] J.M.'s foster father testified about his willingness to support the relationship between S.D.M. and J.M. The Department was unable to support regular visits between Pedregon and the children due to safety concerns.[50]

We conclude the Department exerted active efforts to reunite Pedregon with her children. And Pedregon does not establish any additional tailoring of services was warranted beyond what was offered by the Department. There is not

---

consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents.").

[48] See 25 C.F.R. § 23.2(5) ("Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's tribe.").

[49] See 25 C.F.R. § 23.2(6) ("Taking steps to keep siblings together whenever possible.").

[50] See 25 C.F.R. § 23.2(7) ("Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child.").

a hint of evidence that some form of tailoring might overcome Pedregon's delusional condition.

Pedregon also argues the futility doctrine is inapplicable to termination cases involving ICWA and WICWA.

Under the futility doctrine, "'a parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful.'"[51] In other words, "'[w]here the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services.'"[52]

As a threshold matter, Pedregon fails to provide any citation to the record where the court applied the futility doctrine. In finding of fact 2.14, the court acknowledged, "Ms. Pedregon failed to remain in contact with the Department, the tribe, or the GAL, and her contact information was in flux and not known to the Department. This thwarted the Department's efforts to offer services to Ms. Pedregon."[53] But in the same finding, the court found the Department made active efforts to provide services to Pedregon. Although the court acknowledged Pedregon's unwillingness to engage in services, it did not excuse the Department from continuing to offer services.

---

[51] Matter of K.M.M., 186 Wn.2d 466, 485, 379 P.3d 75 (2016) (quoting In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988)).

[52] Id. at 483 (quoting In re Welfare of C.S., 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010)).

[53] CP at 261.

Without deciding whether the futility doctrine applies to termination cases involving ICWA and WICWA, we conclude the court did not apply the doctrine in this case.

**II. Did the court apply the appropriate standard to its finding that Pedregon's continued custody is likely to result in serious emotional or physical damage to S.D.M. and J.M.? Does substantial evidence support this finding?**

Pedregon argues the court failed to find the Department proved beyond a reasonable doubt that her continued custody would likely result in S.D.M. and J.M. experiencing serious emotional or physical damage.

As previously discussed, prior to terminating parental rights, the court must find certain statutory factors by clear, cogent, and convincing evidence. ICWA and WICWA also require a termination order be *"supported by evidence beyond a reasonable doubt,* including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[54] "[T]he evidence *must show a causal relationship* between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child who is the subject of the child-custody proceeding."[55]

---

[54] 25 U.S.C.A. § 1912(f); RCW 13.38.130(3) (emphasis added).
[55] 25 C.F.R. § 23.121(c) (emphasis added).

Here, the court found "[c]ontinued custody of the child by Ms. Pedregon would result in serious emotional or physical damage to the child."[56]

Pedregon first contends the trial court failed to require proof beyond a reasonable doubt. Pedregon's argument fails because the court expressly determined "[t]he requirements of the Indian Child Welfare Act have been established beyond a reasonable doubt."[57]

We conclude the trial court applied the correct standard.

Alternatively, Pedregon argues, even if the court applied the correct standard, the Department failed to meet its burden.

At the termination trial, the court considered expert testimony from Trueblood and Messmann. During direct examination, the State asked Trueblood, "Do you have an opinion as to whether continued custody of [S.D.M.] or [J.M.] by Ms. Pedregon would likely result in serious emotional or physical damage to these children?"[58] Trueblood testified, "Yes. If they were returned to the mom I feel like that it would be physically and emotionally damaging."[59] Similar to Trueblood, Messmann opined that Pedregon's continued custody of S.D.M. and J.M. would likely result in physical or emotional damage.

---

[56] CP at 262 (Finding of Fact 2.18).

[57] CP at 263 (Conclusion of Law 3.5).

[58] RP (Jan. 30, 2018) at 90.

[59] Id. at 91.

We conclude the Department proved beyond a reasonable doubt that Pedregon's continued custody of S.D.M. and J.M. is likely to result in serious emotional or physical damage to the children.

### III. Incarcerated Parent Statute

Pedregon contends the court failed to consider the incarcerated parent factors before terminating her parental rights.

In a termination proceeding, if a parent is incarcerated, the court must consider the following factors: (1) "whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b);" (2) "whether the department . . . made reasonable efforts as defined in this chapter;" and (3) "whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child."[60]

Under RCW 13.34.145(5)(b),

[t]he court's assessment of whether a parent who is incarcerated maintains a meaningful role in the child's life may include consideration of the following:

(i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;

(ii) The parent's efforts to communicate and work with the department or other individuals for the purpose of complying with the

---

[60] RCW 13.34.180(f).

22

service plan and repairing, maintaining, or building the parent-child relationship;

(iii) A positive response by the parent to the reasonable efforts of the department;

(iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;

(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

Here, Pedregon was incarcerated at various times during the dependency and during the termination trial. The court addressed the first factor when it found Pedregon "failed to maintain a meaningful relationship or contact with [either] child."[61] Pedregon does not challenge this finding, and unchallenged findings are verities on appeal.[62] The court considered the second factor in the previously discussed findings concerning active efforts. And finally, the court addressed the third factor when it found

Ms. Pedregon was incarcerated during the dependencies on several occasions, including during the termination trial. Cumulatively, these periods of incarceration did not constitute a significant portion of the

---

[61] CP at 260 (Finding of Fact 2.11).

[62] Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992).

four year time period at issue in the case, and did not materially affect Ms. Pedregon's relationship with [either child] or her ability to engage in required services. Ms. Pedregon's failure to maintain a meaningful role [in either child's] life is not a result of incarceration.[63]

We conclude the court adequately considered the incarcerated parent factors before terminating Pedregon's parental rights.[64]

Therefore, we affirm.

WE CONCUR:

---

[63] CP at 261 (Finding of Fact 2.16).

[64] Pedregon also argues the court must enter written findings addressing the incarcerated parent factors. But in In re Parental Rights to K.J.B., 187 Wn.2d 592, 603-04, 387 P.3d 1072 (2017), our Supreme Court determined the incarcerated parent statute does not require written findings of fact. Although Pedregon acknowledges K.J.B., she argues CR 52 requires written findings. Without deciding whether CR 52 applies in this situation, as previously discussed, the court did enter written findings addressing the incarcerated parent factors.