# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>M.L.W. (DOB 09/05/2006);<br>I.A.W. (DOB 01/06/11), and<br>M.W. (DOB 03/29/2014),<br><br>               Minor Children.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF CHILDREN,<br>YOUTH, AND FAMILES<br><br>               Respondent,<br><br>       v.<br><br>ELI MARK SPAULDING,<br><br>               Appellant. | No. 79796-4-I<br>(consolidated with Nos. 79798-1-I<br>and 79797-2-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — Eli Spaulding, the alleged father of M.L.W., I.A.W., and M.W., appeals an order finding all three children dependent. He claims the evidence was insufficient to support the court's finding that he was not capable of caring for his children. We affirm.

## FACTS

Tanisha Wright is the mother of M.L.W., I.A.W., and M.W. Eli Spaulding is the alleged father of all three children and is the only father they have known. M.L.W. and I.A.W. have no father listed on their birth certificates and the Department of Children, Youth, and Families (Department) has not yet been able

Citations and pin cites are based on the Westlaw online version of the cited material.

to locate M.W.'s Arizona birth certificate. Spaulding acknowledges he is not M.W.'s biological father but has declined to undergo any genetic testing to verify that fact.

The family has been involved with child welfare agencies in both Washington and Arizona since 2006, when M.L.W. was an infant. M.L.W. was first removed from the home in 2006 and the Department filed a dependency petition alleging M.L.W. was in a dangerous environment due to Wright's and Spaulding's methamphetamine use. Spaulding admitted to using methamphetamine during that time. The dependency petition was dismissed upon Wright's agreement to move M.L.W. to Arizona to be with family and participate in recommended services. In 2011, another dependency petition was filed in Arizona based on Wright's drug use and negligent treatment. M.L.W. and I.A.W. were found dependent, and in December 2012 the dependency was dismissed after Wright completed inpatient treatment and a psychological evaluation. There have also been multiple referrals to Child Protective Services (CPS) involving the family.

Spaulding has not consistently lived with Wright and the children. According to Spaulding, after M.L.W. was first removed from the home, Spaulding "gave [Wright] some space" and M.L.W. "was never returned to [Spaulding's] care." At times, Spaulding stayed with his "aunt" (biologically his great aunt and also his adoptive mother), Elsie Isaacson. He was also incarcerated during other periods of time. In the few years leading up to the filing of the dependency petition at issue here, the children moved frequently with Wright, and at times, with Spaulding, staying in shelters, at friends' homes, with Isaacson, and in an RV (recreational

2

vehicle). As a result, the children changed schools four different times in two years. The children also missed school while under Wright's and Spaulding's care.

In April 2018, Spaulding was living with Leandra Johnson and the children were with him there "off and on." During that time, police responded to a report of sexual abuse of I.A.W. by Johnson's teenage son. Spalding struggled with an appropriate response to I.A.W.'s disclosure. While Wright believed I.A.W., Spaulding was "unsure" if I.A.W. was telling the truth and did not believe she was in a dangerous situation. Neither parent took any further measures following the disclosure.

In July 2018, CPS conducted an investigation into concerns about the supervision of the Wright children. By this time, the family already had a history of Department involvement, including a "significant number" of intakes, mostly related to the parents' drug use, supervision concerns, and leaving the children with unsafe individuals. During the CPS investigation, staff at the Aurora drop-in center reported the family had been at the center. A CPS investigator who went to the center to look for the family observed only adults there and many appeared to be under the influence of drugs and alcohol. There was no childcare at the center or any other structure to supervise children. This raised concerns for the investigator who learned that the children were often there without the mother.

In August 2018, the family was living in an RV in the Greenwood area of Seattle. The children were 11, 7, and 4 at the time. The oldest, M.L.W., was often responsible for caregiving, and there were reports of the children being left unattended and going to neighbors for food. During one incident, the children were

left unsupervised and ended up at a Fred Meyer store in Ballard. According to Spaulding, they were only gone about five minutes before he realized they were missing. He then received a call from police who found them roaming around the Fred Meyer store.

Following the investigation, the assigned CPS social worker concluded that there were safety risks warranting removing the children from the home, citing inadequate supervision, parental drug use, and the children's needs not being met. CPS found negligent treatment or maltreatment on the part of both parents based on reports that the children were left unattended at Greenwood Park, asked the neighbors for food, and were found stealing and unattended at a grocery store. The children had also reported that M.L.W. had to intervene during a physical altercation between Wright and Spaulding and that M.W. was burned by hot oil splatter from pan left unattended in the kitchen.

On August 8, 2018, the Department filed a dependency petition. On August 14, 2018, the children were placed in out of home care after a contested shelter care hearing. M.L.W. was placed with Isaacson and the other children were placed in licensed care. The Department recommended that both parents undergo a psychological evaluation with a parenting component and a chemical dependency assessment, follow treatment recommendations, participate in 60 days of random urinalysis and an evidence-based parenting program, and that Spaulding establish paternity. The Department gave them referrals for urinalysis and chemical dependency evaluations, and offered both parents psychological evaluations and evidence-based parenting instruction, information about mental health counseling,

4

and information about community housing resources, but neither parent participated in the offered services.

The Department set up regular supervised visitation with the children, but Wright and Spaulding often missed or were late to the visits. Spaulding missed a large number of visits and left early at times or fell asleep during the visit. The children had strong emotional reactions when visits were cancelled.

In November 2018 Spaulding pleaded guilty to fourth degree assault-domestic violence, committed against Johnson, his girlfriend at the time.

On March 11, 2019, the parties appeared for the fact finding trial on the dependency. Wright entered an agreed order of dependency, but Spaulding proceeded to trial. After an eight day trial, the court found that "the child[ren] had no parent, guardian or custodian capable of adequately caring for [them] such that the children are in circumstances which constitute a danger of substantial damage to the child[ren]'s psychological or physical development," and concluded they were dependent under RCW 13.34.030(6)(c).

Spaulding appeals.

DISCUSSION

Spaulding claims the trial court lacked sufficient evidence to find the children dependent under RCW 13.34.030(6)(c). We disagree.

"[A] trial court has broad discretion in evaluating all of the evidence before it when determining whether [a] dependency order should be entered or continued." In re Dependency of Schermer, 161 Wn.2d 927, 952, 169 P.3d 452 (2007). To evaluate a claim of insufficient evidence in a dependency case, we

5

review the juvenile court's findings for substantial evidence. In re Dependency of C.M., 118 Wn. App. 643, 649, 78 P.3d 191 (2003). "Evidence is substantial when, viewed in the light most favorable to the prevailing party, a rational trier of fact could find the fact by a preponderance of the evidence." In re Welfare of A.L.C., 8 Wn. App. 2d 864, 871, 439 P.3d 694 (2019). We treat unchallenged findings of fact as verities on appeal. In re Dependency of P.D., 58 Wn. App. 18, 30, 792 P.2d 159 (1990).

"While parents have a fundamental liberty interest in the care and custody of their children, the State has a duty to intervene to protect the physical, mental, and emotional health of the child." In re Dependency of A.L.F., 192 Wn. App. 512, 522, 371 P.3d 537 (2016). "[T]he goal of a dependency hearing is to determine the welfare of the child and his best interests" and "the relatively lenient preponderance standard in a dependency proceeding" facilitates "the important function of allowing state intervention in order to remedy family problems and provide needed services." Schermer, 161 Wn.2d at 942 (alteration in original).

In a dependency action, the Department must prove by a preponderance of the evidence that a child is dependent within the meaning of RCW 13.34.030. RCW 13.34.110(1). The statute defines a "dependent child" as one who:

> (a) Has been abandoned;
> (b) Is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for care of the child;
> (c) Has no parent, guardian or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development; or
> (d) Is receiving extended foster care services, as authorized by RCW 74.13.03.

6

RCW 13.34.030(6). Where, as here, the court determines that a child is dependent under (6)(c), the court is not required to find the parent unfit. Schermer, 161 Wn.2d at 944. Rather, the court considers "a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs." Id. In doing so, the court considers "the constellation of facts presented . . . as a whole, in the light most favorable to the [Department]." Id. at 952.

Spaulding contends the court improperly relied on evidence of the Fred Meyer incident in finding him incapable of caring for the children. Specifically, he assigns error to the court's finding that Spaulding "testified that they had been missing for five minutes, although that was inaccurate based on other testimony," contending it was not supported by the record. He further contends that the court "likely relied on this flawed view of the evidence" in its additional findings that he was inconsistent in his testimony about his ability to care for the children and lacked insight into his parental deficiencies, and these findings were "integral to the court's ultimate dependency finding."

We agree that substantial evidence does not support the court's finding that Spaulding's testimony that the children had been missing for five minutes "was inaccurate based on other testimony." Spaulding testified that the children had been gone five minutes before he realized they were missing. And, as the State concedes, there was no other testimony about how long the children were missing before the parents realized they were gone.

But, this erroneous finding does not invalidate the court's additional findings that Spaulding was inconsistent in his testimony about his ability to care for the

children and lacked insight into his parental deficiencies, as Spaulding suggests. Neither of those findings reference the Fred Meyer incident and substantial evidence supports both findings.

Finding 2.2.26 states,

Mr. Spaulding was inconsistent in his testimony about his ability to care for the children. He said he had not planned where he could live with the children, he knew the RV would not be an appropriate home, he would probably need help to care for the children, and he would prefer to live with Ms. Isaacson if he had custody of the children. Ms. Isaacson testified that living with her would not be an option. While Mr. Spaulding later testified that he was a capable of taking care of his children, that testimony was not credible based on his earlier testimony and based on Ms. Isaacson's testimony. His untreated drug dependency adversely impacts his ability to care for the children.

The record shows Spaulding testified inconsistently on this issue. While he testified he was capable of parenting the children, he never told the court he wanted them placed with him. Rather, he testified that it seemed "pretty far-fetched" the children would live with him because the "RV is not an option," and that he would not want to have custody "unless it was all right for me to live with [Isaacson]." Isaacson testified she would not permit Spaulding to live with her "because he needs to be working," and "it just doesn't work with the drugs." She also testified she had concerns for the children's safety if they were returned to the parents. In particular, she was concerned about "drug use and not having an adequate place to live and not having adequate attention."

The court found Isaacson's testimony credible and helpful. The court found Isaacson "was cognizant of [Spaulding's] drug use and limitations as a parent" and "did not support having Mr. Spaulding live with her. Without this support, Mr.

8

Spaulding had no concrete plan to meet the basic needs of the children." These unchallenged findings are verities on appeal. Substantial evidence supports finding 2.2.26.

Finding 2.2.30 is likewise supported by substantial evidence. That finding states,

> Mr. Spaulding lacks insight into his deficiencies as a parent. Mr. Spaulding has never been primary caretaker. He had difficulty in describing the day to day responsibilities of being a parent, although he did describe the overall requirement of being responsible and putting the children first. He understood his RV was not a good place for the children and that he would be unable to take care of the children if he was under the influence. He was unable to recognize the impact his inconsistent visits had on the children. Despite having concerns about neglect of the children by Ms. Wright, Mr. Spaulding has failed to take any action. While some of that may be attributable to not having custodial rights, it also is clear that Mr. Spaulding did not always recognize the struggles Ms. Wright had to meet the children's basic needs. Despite the agreed dependency petition of Ms. Wright, Mr. Spaulding continues to believe she is fully capable of taking care of the children.

Spaulding testified that after M.L.W. was first removed from the home, M.L.W. was never returned to his care and that he was incarcerated when M.W. was born. He further testified that he lived with Wright and the children "off and on for years," and did not respond when asked if he was the children's primary caregiver this past fall. He also testified he understood generally that being a parent requires sacrifice and responsibility as modeled by Isaacson's parenting of him, but he did not explain what he saw as the day-to-day responsibilities of parenting. And, while he testified it would be "a horrible idea" to take care of the children when he is high and that he has never done so, he also testified to using methamphetamine as recently as the week before trial. He also admitted to being

9

"an addict," though claimed he "could go without it." The court did not find him credible when he testified he could just stop using methamphetamine without any assistance, and we defer to the trial court's credibility determinations. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990) ("Credibility determinations are for the trier of fact and cannot be reviewed on appeal."). Additionally, we accept as a verity the court's unchallenged finding that "there is evidence his drug use has affected his parenting abilities."

The record also demonstrates that Spaulding failed to appreciate how the missed visits impacted the children. While he acknowledged that missing visits has an impact on the children, he admitted that he attended a "pretty low percentage" of visits that were offered. He also cited "personal reasons" for missing visits, which included attending a vehicle auction. In fact, he could not remember when he attended the last visit and said he did not attend the most recent visit because he "was busy." As the trial court found,

> The parents were inconsistent with making the visitation with the children. Although some of the missed visits may have been due to the changing locations, changing times, and confirmation requirements, even when the visit schedule stabilized, the parents' visits were inconsistent. They were very late to visits or failed to appear entirely on multiple occasions. Mr. Spaulding in particular missed a large number of offered visits. He also left early on occasion or fell asleep during visits. These missed visits had a profound impact on the children. Mr. Spaulding had a limited insight into how missing visits impacted the psychological wellbeing of his children. Ms. Bailley[, a visit supervisor,] testified about [I.A.W.]'s emotional reactions when a visit was cancelled, sometimes clinging to her for a long time.

This unchallenged finding is a verity on appeal.

The record further demonstrates Spaulding's inability to recognize Wright's

deficiencies. He testified that he believed the children were safe with Wright even after her agreement to the dependency order. That order was based on findings that the children are in circumstances that constitute a danger of substantial damage to their development, having no parent capable of adequately caring for them. Substantial evidence supports finding 2.2.30.

With the exception of the finding that Spaulding's testimony that the children had been missing for five minutes "was inaccurate," substantial evidence supports the challenged findings. These findings support the court's determination that Spaulding was not capable of adequately caring for the children "such that the children are in circumstances which constitute a danger of substantial damage to the child[ren]'s psychological or physical development."

We affirm the order of dependency.

_Appelwick, J._

WE CONCUR:

_Leach, J._