# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of

J.L.P.

STATE OF WASINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

Respondent,

v.

WILLIAM G. PARENT,

Appellant.

No. 78409-9-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: June 10, 2019

APPELWICK, J. — After a dependency of more than four years, the juvenile court terminated the parental rights of William Parent. The father claims the trial court violated his right to due process by terminating his rights based on a "fractured bond" with his child, a parental deficiency of which he did not receive adequate notice before the fact-finding hearing. However, the court did not identify inadequate bonding as a parental deficiency or terminate his parental rights on this basis. He fails to demonstrate a due process violation. In addition, substantial evidence supports the court's findings with regard to the statutory factors necessary for termination. We affirm.

FACTS

William Parent is the father of J.L.P., who was born on November 14, 2010. Approximately five years before J.L.P. was born, the father was convicted of two counts of child molestation in the second degree based on evidence that he forced two 13 year old girls to ingest cocaine, had sex with them, and then threatened them to ensure their silence. The father was almost 19 years old at the time. According to a sexual deviancy evaluation conducted at the time of the convictions, the father was not amenable to treatment due to his "'poor judgment, low level of empathy, and selfishness.'" The evaluator noted "intellectual impairments," notable immaturity, and a relationship between the father's "history of hostility and his level of anxiety." The evaluator noted the father's preexisting diagnoses of depression and paranoia, anxiety and cognitive disorders, and delusional disorder-persecutory type.

The court imposed a sentence of 31 months. After he was released from prison in 2007, the father served a three year term of community custody. During that period, he violated the conditions of supervision on numerous occasions by failing to attend sex offender treatment, consuming alcohol, failing to report, and failing to reside at an approved residence.

Also during this time, the father became involved in a relationship with J.L.P.'s mother, Michelle Nelson.[1] After completing his term of supervision in Washington, the father moved to Texas with Nelson. J.L.P. was born there. Soon after J.L.P.'s birth, the father left the mother and child, "stocked with food and

---

[1] The mother is not a party to this proceeding.

diapers," in Texas and moved to Oklahoma because of Nelson's alcohol use. Nelson went to Oklahoma with J.L.P. and stayed with the father for a brief period, but Nelson continued to use drugs and alcohol, and the relationship ended. Nelson returned to Washington with J.L.P. The father did not obtain a parenting plan or pay child support, but he "checked on" the mother.

In 2013, when J.L.P was almost three years old, Child Protective Services removed her from Nelson's care, due to concerns about drug use and possible neglect. The father was still living in Oklahoma, serving a 3 year term of probation for violating sex offender registration requirements by residing in proximity to school property.

In December 2013, the father entered into agreed dependency and dispositional orders for J.L.P. He stipulated that he was unable to provide a stable home for his child until his release from supervision and agreed to complete parenting classes. The Department of Children, Youth, and Families (Department),[2] placed J.L.P. in the care of her maternal aunt.

After completing his probation in Oklahoma, the father relocated to Washington in February 2014. He obtained housing and employment. The court imposed additional requirements on the father and ordered him to participate in random urinalysis testing and complete a mental health assessment. During the six months that followed his return to Washington, the father successfully completed the random urinalysis testing and parenting classes. The father also regularly visited J.L.P. J.L.P.'s maternal aunt, with whom J.L.P. was placed at the

---

[2] Formerly the Department of Social and Health Services.

3

time, supervised the father's visits. Because J.L.P. did not know her father and the father did not appear to know how to initiate interaction, the aunt helped to facilitate the visits and provided activities for them to do together.

The father obtained a mental health assessment in 2014. According to that assessment, the father "did not exhibit or describe any symptoms consistent with a mental health disorder," but was experiencing situational distress due to separation from his child.

In August 2014, the court placed J.L.P. with the father for a six month trial period. During this time, the father's parents provided substantial support. The father generally left the child at his parents' house before 8 a.m. When he returned in the evening after working a 10 hour day, he and J.L.P. ate dinner at his parents' home. J.L.P. usually fell asleep in the car on the way home and the father transferred her to bed. On the occasional day when the father did not have to work, they often went to his parents' house to play in the yard or pick up laundry that his mother did for them. Although J.L.P. had been living with her aunt for the previous year, the father did not respond to the aunt's attempts to contact him and did not facilitate contact between J.L.P. and her aunt.

In February 2015, the Department removed J.L.P. from the father's care based on concerns, reported by the father's mother, that the father inappropriately touched J.L.P. J.L.P. has not lived with her father since that time. The father severed ties with his parents based on this incident. The Department placed J.L.P. in the care of her aunt again and then another relative and eventually placed her in licensed foster care. The Department investigated and eventually determined

that the allegation of inappropriate contact was unfounded. The State did not file criminal charges as a result of the incident. The State filed a petition to terminate the father's parental rights.

While J.L.P. was placed with the father, the Department became aware that he had not completed the sex offender treatment ordered in connection with his 2005 convictions. Therefore, the court ordered him to complete an updated sexual deviancy evaluation.

Jason Bailey conducted a sexual deviancy evaluation in 2015. According to Bailey, the father required constant redirection, exhibited "odd behavior, rapid speech, flight of ideas, persecutory beliefs, and rapidly changing mood." His behavior suggested possible deficits in "attention, thought processes, and/or cognitive function." Bailey concluded that the father's symptoms "tend to amplify" with stress, resulting in a "wide spectrum of his ability to function." The results of psychological testing indicated a personality disorder, likely a paranoid or passive-aggressive personality. Bailey reported that individuals with the father's psychological profile tend to be "chronically maladjusted," impulsive, have delusional beliefs, and tend to be poor candidates for treatment. While Bailey assessed the father's risk for committing future acts of sexual misconduct as low to moderate, he concluded that the primary concerns raised by the evaluation related to the condition of the father's mental health. Among other things, Bailey recommended an updated mental health evaluation.[3]

---

[3] Bailey also recommend that the father engage in a sexual deviancy treatment program, and the father complied with this recommendation.

5

After receiving Bailey's evaluation, the court ordered the father to undergo a neuropsychological evaluation. In August 2015, Clinical Psychologist Michael O'Leary conducted the evaluation. During the evaluation, the father was agitated, frequently overwhelmed by frustration, and had several angry outbursts. O'Leary diagnosed the father with numerous disorders including a mild neurocognitive disorder, intermittent explosive disorder, antisocial personality disorder, adjustment disorder, and paranoid personality disorder. Testing revealed an "unusually low level of empathy" indicative of an inability to understand and appreciate his child's developmental and emotional needs. Test results also suggested rigidity, lack of nurturing skills, and inability to cope with normal parenting stressors. The father's lack of emotional control was "extraordinary" and he was not able to complete all the testing due to "out-of-control behavior."

O'Leary concluded that, due to the father's mental status, he was "not capable of providing an adequately stable, structured, safe, and consistently nurturing environment for his child now or in the foreseeable future." According to O'Leary, even if the father could demonstrate adequate parenting skills, his "response to environmental stressors is so extreme and disorganizing that it would present an imminent risk to the safety and welfare" of J.L.P. Consistent with the conclusions of Bailey's evaluation, O'Leary expressed the opinion that the father was not amenable to treatment and did not appear to have the capacity for insight necessary for therapeutic progress. Nevertheless, O'Leary recommended treatment with mood-stabilizing medication and/or antidepressant or antipsychotic medication and Moral Reconation Therapy (MRT), focused on specific challenges

of parenthood. O'Leary concluded that Dialectical Behavioral Therapy (DBT) might be helpful in the future depending on the father's progress.

In contrast to these evaluations, Barry Nyman, another clinical psychologist, conducted a psychological evaluation with a parenting component in 2016. He relied on his observation of the father's visit with J.L.P. and on the largely positive reports of visitation supervisors and a mental health counselor. Nyman concluded that under certain conditions, the father could "follow and implement parenting instruction" and the father had "demonstrated commitment" to parenting J.L.P. Nyman also concluded it would be in J.L.P.'s best interests to be returned to the care of her father.

The court ordered the father to engage in mental health counseling as an additional service starting in 2015. In 2016, the court ordered the father to participate specifically in both DBT and MRT. The father began mental health counseling with Beatrice Kaufman in 2015 and started taking psychotropic medication. Kaufman was aware that DBT was recommended for the father, but determined that type of therapy was not a good fit. Although he appeared to benefit from the counseling and medication, the father stopped engaging in therapy for a period in the spring of 2016 and then stopped altogether in March 2017.

The father's behavior began to deteriorate in 2016. He had conflict with visitation supervisors and problematic behavior during visits. The court ordered the father to participate in anger management classes, a "critical service," in January 2017 and again in May 2017. The Department referred the father to a parent coach, John Hybridge. Hybridge worked with the father during visits for

7

several months to shift his focus from his anger at the Department toward his relationship with his daughter. Over the course of working together, the father's visits with J.L.P. became more positive and interactive and J.L.P. appeared to be more enthusiastic about visits. Hybridge recommended liberalizing visitation.

Acting on Hybridge's report and the father's counselor's recommendation, the Department allowed the father's visits to be unsupervised in early 2017. The court required the father to return J.L.P. to her school after the visits. But, after the father ceased mental health counseling in March 2017, his behavior deteriorated. On a couple of occasions, he refused to return J.L.P. to school. The first time, he cited a problem with his vehicle and the social worker had to obtain a car seat and drive to the father's home to pick up J.L.P. The second time, the father did not provide a reason and would not tell the social worker where he was. Eventually, an after-hours social worker and police officers located J.L.P. at the father's home and escorted her home. The father yelled and screamed that they did not have the "right paperwork." The court allowed the father's visits to remain unsupervised despite these incidents, contingent on the father's renewed agreement to transport the child and the Department's agreement to provide gas vouchers. The court also ordered the parties to work together on a possible transition plan to the father's care.

In May 2017, the Department held a Family Team Decision Making meeting. When the father learned that the Department was contemplating transitioning J.L.P. to his care at the end of the school year, and not by the Memorial Day holiday as he expected, he stormed out and refused to engage with the Department. After

8

this, the court required the father's visitation to again be supervised and directed the father to engage in anger management before any transition to his care could occur

A domestic violence treatment supervisor, Timothy Tackels, conducted an anger management assessment in June 2017. Tackels had difficulty eliciting background information from the father because he only wanted to discuss certain issues in the dependency case. Tackels recommended that the father complete a 12 week anger management session. But, after the father attended a few group sessions and private counseling sessions, Tackels concluded he was not amendable to treatment because he was unable to focus on the substance of the sessions.

Another mental health treatment provider assessed the father in August 2017 and recommended "trauma informed counseling." Although the father was ordered to engage in an anger management program, MRT with a new therapist, and CBT counseling, father made it clear that he was not interested in participating in counseling or any further services. The father's behavior became more unstable and his communications with the social worker became increasingly disjointed and hostile. He referred to the social worker as a "human trafficker."

Visits with J.L.P. also gradually deteriorated. The father's behavior was unpredictable and he made cryptic and alarming remarks to J.LP. For instance, he ended a visit at an Everett park early, telling the child, "'[w]e need to go because I don't feel safe.'" Apparently referring to the Department's social workers or visitation supervisors, he told J.L.P., "'[d]on't trust them. They're not your friends.'"

On a visit in September 2017, J.L.P. asked the visit supervisor to take her home early. The father told J.L.P. she was "never going to get out of foster care" if she continued "listening to social workers." He told J.L.P. she had been "kidnapped," "coached," and "brainwashed." During another visit, when they were looking at holiday decorations, the father told J.L.P., "You don't get to have Christmas because you're not part of a family."

The agency providing visitation supervision terminated the contract because supervisors could not work with the father. Because the Department could not find another agency to provide supervision, the social worker began monitoring visits. Sometimes, the father played with his phone and interacted only minimally with J.L.P. during visits. Other times, the father "grilled" J.L.P. about aspects of the case and about her foster family.

At the time of the four-day fact-finding hearing, J.L.P. was seven years old. She had lived in the same foster home for more than a year. Several members of J.L.P.'s extended family were interested in pursuing adoption. J.L.P.'s foster family was also willing to adopt if family placement was unavailable.

The father's testimony at trial was vague, contradictory, hostile, and often nonsensical. He refused to answer many of the Department's questions. The father continually disrupting the proceedings. The father described J.L.P. as "kind of a possession." The father said he did not need counseling, counseling was not his "hobby," and he was "sick" of participating in services. He indicated that the Department wanted him to participate in an anger management program because he refused to agree to put J.L.P. in daycare. The father described his visits with

J.L.P. as "pretty lame" because he was tired of going to parks and festivals and being supervised. When asked how he planned to take care of his daughter if returned to him, given his prior reliance on family members, the father responded, "None of your business." When asked if he felt any remorse about the incidents that led to his sex offense convictions, he responded, "Yeah, registration sucks."

The social worker, who had been assigned to the case since 2016, testified that the father was currently unfit to safely parent his daughter and that his primary parental deficiency was his unstable mental health. Given his unwillingness and/or inability to change his behavior, the social worker also testified there was little likelihood this deficiency could be remedied so that J.L.P. could be placed in the father's care in the near future. The social worker opined that termination of parental rights was in the best interest of J.L.P. because she had been dependent for more than four years and needed permanency. Likewise, the court appointed special advocate testified that the father's behavior presented a serious risk to J.L.P.'s mental health and emotional well-being and that termination was in her best interests.

At the conclusion of the fact finding hearing, the court entered an order terminating the father's parental rights and extensive written findings. The father appeals.

DISCUSSION

I. Standard of Review

To terminate parental rights, the Department must satisfy a two pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). The

Department must first prove the statutory elements set forth in RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence. Id. at 576-77. Evidence is clear, cogent, and convincing if it established the ultimate fact in issue as "'highly probable.'" In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). Second, if the trial court finds that the Department has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interest" of the child. K.N.J., 171 Wn.2d at 577.

Where the trial court has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009) (quoting World Wide Video, Inc. v. City of Tukwila, 117 Wn.2d 382, 387, 816 P.2d 18 (1991)). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required." P.D., 58 Wn. App. at 25. In determining whether substantial evidence supports the trial court's findings, this court does not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

II. Due Process

Parents have a fundamental liberty interest in the care and welfare of their children. In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). Parental rights cannot be abridged without due process of law. In re Dependency of A.M.M., 182 Wn. App. 776, 790-91, 332 P.3d 500 (2014). Due process requires "'that parents receive notice of the specific issues to be considered'" at a termination hearing. Id. at 791 (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P .2d 134 (1970)). Such notice is required "'to prevent surprise, helplessness and disadvantage.'" Id. (quoting Martin, 3 Wn. App. at 410).

The father contends that the trial court violated his right to due process by terminating his parental rights based, in part, on a "fractured" bond with J.L.P. He further claims he was not notified prior to the hearing that bonding or attachment issues constituted a parental deficiency upon which termination could be based.

The essential premise of the father's argument is incorrect. The court did not identify insufficient parental bonding or attachment as a parental deficiency. The court also did not terminate the father's parental rights based on an inadequate or unstable bond with J.L.P. Instead, the court determined that the father was unfit as a result of several mental health conditions:

> [J.L.P.'s] dependency case has been active for more than four years. Father was not initially perceived to have parental deficiencies that would interfere with the prompt placement of [J.L.P.] in his care. However, there is clear, cogent, and convincing evidence that [the father] suffers from complex mental health disorders, including one or more personality disorders, which prevent him from safely parenting [J.L.P.].

13

The court further found that the Department offered extensive services to the father to address the "persistent concerns about his mental health and how his mental health might affect his ability to parent [J.L.P.]." The court also found that despite engaging in some of these services, the father made no long-term progress. The court found that due to the nature of the father's mental health issues, he was resistant to change and "unable to integrate the lessons he has learned into his life and in that way change his behaviors."

In discussing some of the effects of the father's mental health problems, the court determined that the father's unstable mental health negatively affected his relationship with J.L.P.:

> The father's negative behaviors have a profoundly detrimental effect on [J.L.P.]. The impact is evident in visit notes. It is also evident in the fractured bond between the father and [J.L.P.]. The father believes that [J.L.P.] has been poisoned against him by others. He lacks the capacity to see that his own behaviors have caused her to be distrustful and wary of him.

This case is different from A.M.M. in several relevant respects. There, the dependency proceedings and the termination hearing focused on the mother's substance abuse problems. Id. at 780-83. But, the trial court then terminated the mother's parental rights based on a separate parental deficiency, in addition to substance abuse, of which she was not informed before trial. Id. at 792. Here, the juvenile court made no finding that insufficient bonding or lack of attachment was a parental deficiency or barrier to reunification. The court identified only the impact of the father's mental health on his relationship with his child. The father fails to establish a due process violation.

14

III. <u>Provision of Necessary and Reasonably Available Services</u>

The father advances a related argument that the Department failed to satisfy RCW 13.34.180(1)(d), because it failed to offer attachment or bonding therapy as a service.

In order to terminate parental rights, the Department must prove that it offered "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). "Necessary services" are those services "'needed to address a condition that precludes reunification of the parent and child.'" In re Parental Rights of K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016) (quoting A.M.M., 182 Wn. App. at 793).

The court found,

> Father has received many services throughout this dependency case. These services include a psychological evaluation, a psychological evaluation with parenting component, mental health counseling (including cognitive behavioral therapy ("CBT") and attempts at more specific types of CBT known as Moral Reconation Therapy ("MRT") and Dialectical Behavioral Therapy ("DBT"), parent coaching, a neuropsychological evaluation with parenting component, anger management treatment, a sexual deviancy evaluation, sexual deviancy treatment, and medication. The father has not completed all of these services.

The court further found that "[a]ll necessary services reasonably available, capable of correcting the father's parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided."

The record supports the court's finding that the Department offered numerous services to address the father's mental health, and the father does not contend otherwise. As explained, neither the court nor the Department identified inadequate bonding or attachment as a parental deficiency or a circumstance that

precluded reunification. Therefore, attachment or bonding therapy was not a necessary service within the meaning of RCW 13.34.180(1)(d).

The court did not order bonding or attachment therapy. Nevertheless, the father argues that the Department should have offered these services because O'Leary's evaluation and some visitation reports put the Department on notice that the father "might" have a parental deficiency related to bonding or attachment. But, while O'Leary's evaluation reported test results indicative of low empathy and a limited capacity for bonding, he did not identify or describe lack of capacity for bonding or attachment as a parental deficiency. Instead, O'Leary's report identified the father's "cognitive, personality, and impulse-control disorders as the primary barriers to reunification. He concluded that the father's pathology and cognitive status made him resistant to change, resulted in erratic behavior, and compromised his ability to cope with stress and solve problems. O'Leary did not observe the father interact with J.L.P. He expressed no opinion on the father's relationship with her and did not recommend any service to address attachment issues.

Likewise, no visit reports identified lack of attachment as parental deficiency or indicated that bonding or attachment therapy was a necessary service. Some visitation supervisors reported the father's erratic behavior and portrayed a stilted and sometimes difficult relationship between the father and J.L.P. To address these issues, the Department appropriately provided the father with the services of a parent coach who was also a mental health therapist to help the father bolster and improve his relationship with J.L.P. Substantial evidence in the record

16

supports the court's finding that the Department offered all necessary and reasonably available services capable of correcting the father's parental deficiency.

IV.     Early Integration into a Stable and Permanent Home

Finally, the father challenges the evidentiary basis for the court's finding that continuation of the parent-child relationship would diminish J.L.P.'s early integration into stable and permanent homes, as required by RCW 13.34.180(1)(f). The father argues that at the time of the hearing on the Department's petition (1) adoption was not imminent and (2) the evidence did not show that J.L.P. was "devastated" or otherwise harmed by the continuation of visits.

RCW 13.34.180(1)(f) is chiefly concerned with "'the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home. The State does not have to prove that a stable and permanent home is available at the time of termination.'" In re Dependency of K.D.S., 176 Wn.2d 644, 658, 294 P.3d 695 (2013) (quoting In re Dependency of K.S.C., 137 Wn.2d 918, 927, 976 P.2d 113 (1999). Where "prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement," RCW 13.34.180(1)(f) is satisfied. In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013).

Here, the evidence established that, while the Department had not completed its investigation of potential adoptive homes, J.L.P. had multiple prospects for adoption. And, the effect of the continued legal relationship between the father and J.L.P. was that those adoption plans could not move forward. The

17

record supports the court's finding that the Department satisfied RCW 13.34.180(1)(f).

We affirm.

Appelwick, C.J.

WE CONCUR:

Leach, J.

Schindler, J.