# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 79044-7-I |
| | ) | consolidated with |
| K.B., DOB: 07/25/2008, and | ) | No. 79045-5-I |
| F.B., DOB: 08/12/2009, | ) | |
| | ) | |
| Minor Children. | ) | |
| | ) | |
| WASHINGTON STATE | ) | |
| DEPARTMENT OF CHILDREN, | ) | |
| YOUTH & FAMILIES, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| MARCINE BROWN, | ) | |
| | ) | FILED: August 5, 2019 |
| Appellant. | ) | |

VERELLEN, J. — The juvenile court terminated Marcine Brown's parental rights to her two children. Brown left her children with a relative more than six years before the court terminated her rights. She lived out of state throughout the dependency. Brown has significant mental health problems and was involuntarily committed to an inpatient psychiatric treatment center for almost half of the dependency period. Brown claims the trial court violated her right to due process by terminating her parental rights based on a lack of insight into her children's needs, a parental deficiency of which she did not receive adequate notice before

the fact-finding hearing. But the court did not identify lack of insight as a parental deficiency or terminate the mother's rights on that basis. And according to the court's findings, the mother's mental health instability alone warranted termination of her parental rights. Also, the Department of Children, Youth, and Families (Department) was not required to notify the mother in advance of trial that it would potentially argue that services it failed to offer her would have been futile under RCW 13.34.180(1)(d). Brown fails to establish a due process violation. Also, because substantial evidence supports the court's finding that the Department provided all reasonably necessary services capable of correcting the mother's predominant parental deficiency within the foreseeable future, we affirm.

## FACTS

Brown is the mother of K.B., a son born on July 25, 2008, and F.B., a daughter born on August 12, 2009.[1] Brown has a long history of mental illness, dating back to her teenage years. She has been diagnosed with schizoaffective disorder, bipolar type. When inadequately treated, these conditions cause Brown to suffer hallucinations and delusions. Brown has experienced numerous cycles of short periods of stability followed by periods of instability after she would cease

---

[1] This appeal does not involve the parental rights of the children's alleged biological father or the mother's parental rights to her other two children The mother has not parented either of her other children for any significant length of time. The eldest child was removed from her care at six months of age and later adopted. The other child was removed from the mother's care at birth and remains in the custody of the maternal grandmother.

2

treatment or stop taking medication. Since 2006, she has been involuntarily committed to mental health treatment facilities approximately five times.

Around 2011, when K.B. was approximately two years old, the mother left both children in the care of her father.[2] Around five years later, in April 2016, when K.B. was seven years old and F.B. was six years old, the Department took the children into protective custody based on signs of neglect and disclosures of abuse in the grandfather's home. The grandfather claimed he adopted the children, but there was no documentation of his legal custody. The mother was living in Alabama, where she remained throughout the dependency.[3]

The foster parent described the children as "feral" when they moved into her home in 2016.[4] They were "very wild," lacked social skills, and were unable to use utensils or eat at a table.[5] K.B. was very underweight, commonly went to the bathroom outside, and had limited verbal skills. The foster mother, an elementary school teacher, estimated that both children were close to two years behind educationally.

---

[2] Contrary to all the other evidence in the record, the mother testified that she left the children with her father in 2015. Report of Proceedings (RP) (Aug. 28, 2018) at 34.

[3] It is not clear from the record when the mother moved to Alabama, but she told a Department social worker in late 2017 or early 2018 that she had not seen K.B. and F.B. in six or seven years. RP (July 17, 2018) at 127.

[4] RP (July 16, 2018) at 43.

[5] Id.

The Department filed petitions for dependency. In January 2017, following a hearing, at which the mother failed to appear, the court found the children dependent under RCW 13.34.030(c) because they had no parent, guardian, or custodian capable of adequately caring for them. The court ordered Brown to participate in medication management, a psychological evaluation, mental health counseling, and parenting classes. The court later modified the order to require parenting classes only if the mother wanted the children to be placed in her care. The court also later ordered Brown to participate in a domestic violence victim support program.[6]

After the Department placed the children in licensed care, they made specific disclosures of sexual and physical abuse by both the maternal grandfather and his spouse.[7] The children told the foster parents and the guardian ad litem (GAL) about the abuse, and F.B. made disclosures to law enforcement. The Department informed the mother's attorney of the allegations. The Department also held a meeting for the purpose of discussing the allegations. The mother participated by telephone. When Department staff told the mother that the children said the grandfather touched them inappropriately, the mother responded

---

[6] The court ordered participation in a domestic violence victim support group based on the Department's recommendation because its records indicated that Brown spent a brief period in a domestic violence shelter in 2006.

[7] Prior to April 2016, the children's disclosures involved only the maternal grandfather's spouse. According to the Department's case notes, law enforcement investigated, but there is nothing in the record to indicate whether the State charged either the children's grandfather or his spouse with any crime stemming from the disclosures.

that the allegations were untrue and that the children were liars. The mother then began talking nonsensically about the mafia, about Elvis being alive, and about various things being "Obama's fault."[8]

In June 2017, the Department filed a petition to terminate the mother's parental rights. At that time, the mother's whereabouts were unknown. During the dependency, the mother sporadically visited with the children by telephone, but she was often unreachable. In several telephone conversations, the mother brought up inappropriate upsetting topics or made little sense. After an October 1, 2017 telephone call with the children, neither the foster parent nor the Department was able to contact the mother for approximately six months.

In January 2018, the Department learned that the mother had been involuntarily committed to an inpatient psychiatric treatment center in October 2017. At the time of the commitment, Alabama law enforcement found the mother burning her clothes in the street and insisting she had 65 children who were killed in the 9/11 terrorist attack. Five months later, mental health treatment providers were still unable to stabilize Brown, and she continued to struggle with hallucinations and delusions. According to the mother, she was medicated during this time for psychosis, depression, bipolar disorder, and anxiety. In March 2018, the juvenile court found Brown legally incompetent and appointed a GAL to represent her in the dependency proceeding.

---

[8] RP (July 17, 2018) at 183.

In March 2018, after reading a court report, the mother contacted the Department and reiterated her belief that the abuse allegations were false, explaining that the "mafia" was "out to get her family and make them look stupid."[9] The mother once told a Department employee that she wanted her father to bring the children to Alabama so that they could live with her. Otherwise, Brown consistently expressed a preference for the children to be returned to her father.

In June 2018, a month before the hearing on the Department's petition, the mother was transferred to outpatient care. She began participating in outpatient mental health counseling and medication management. At the outset of trial, the court engaged in a colloquy with Brown, found her to be competent, and discharged the GAL.

The fact-finding hearing took place over four days in July and August 2018. By the time the hearing concluded, K.B. was ten years old and F.B. was nine years old. Except for period of a few months in the summer of 2017, when K.B. temporarily stayed with his maternal aunt, the children had been in the same licensed care placement for more than two years. Both children had intensive needs. K.B. had been diagnosed with severe posttraumatic stress disorder (PTSD) and attention deficit hyperactivity disorder (ADHD), and F.B. was scheduled to have a psychological evaluation because of attention deficits. Both children received individual and family therapy and had individual education plans

---

[9] RP (July 17, 2018) at 117.

6

at school. K.B. was taking medication for ADHD, which was helpful to him, and both children had made progress with respect to their challenging behaviors and academics during the dependency.

Brown testified by telephone. She explained that she was forced to leave K.B. and F.B. with her father because of "enemies" who were "stalking" her.[10] She insisted that she had "no idea" why the children were no longer living with her father.[11] Brown continued to insist that the foster parents had "bribed" the children to make false allegations.[12] She was living with her mother, and testified that she was taking psychotropic medication and participating in monthly mental health counseling. Brown relied on her mother for transportation and indicated that as soon as her mother purchased a vehicle, she could attend parenting classes. She again said she wanted the children to be returned to her father so he could bring them to Alabama. The mother acknowledged that the Department offered to pay her expenses to travel to Washington to visit her children and participate in person at the trial, and that she refused because it was "too scary" and "dangerous" to travel because of "murderers."[13]

At the conclusion of the fact-finding hearing, after considering the testimony of six witnesses and 43 exhibits, the court entered extensive findings and orders

---

[10] RP (Aug. 28, 2018) at 49.

[11] Id. at 35.

[12] Id. at 36.

[13] Id. at 42-43.

terminating Brown's parental rights. Specifically, the court found that the mother's mental health instability was her most significant deficit and that there were no services the Department could offer to remedy that deficiency within a timeframe appropriate to her children's needs. Brown appeals the termination orders.

<u>Standard of Review</u>

To terminate parental rights, the Department must satisfy a two-pronged test.[14] The Department must first prove the statutory elements set forth in RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence.[15] Evidence is clear, cogent, and convincing if it established the ultimate fact in issue as "'highly probable.'"[16] If the juvenile court finds that the Department has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interest" of the child.[17]

Where the court below has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law.[18] "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded,

---

[14] In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011).

[15] Id. at 576-77.

[16] In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

[17] K.N.J., 171 Wn.2d at 577.

[18] In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990).

rational person of the truth of the declared premise."[19] The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required."[20] In determining whether substantial evidence supports the trial court's findings, this court does not weigh the evidence or assess the credibility of witnesses.[21]

Due Process

Parents have a fundamental liberty interest in the care and welfare of their children.[22] Parental rights cannot be abridged without due process of law.[23] Due process requires "'that parents receive notice of the specific issues to be considered'" at a termination hearing.[24] Such notice is required "'to prevent surprise, helplessness and disadvantage.'"[25]

---

[19] In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009) (quoting World Wide Video, Inc. v. City of Tukwila, 117 Wn.2d 382, 387, 816 P.2d 18 (1991)).

[20] P.D., 58 Wn. App. at 25.

[21] In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

[22] In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007).

[23] In re Dependency of A.M.M., 182 Wn. App. 776, 790-91, 332 P.3d 500 (2014).

[24] Id. at 791 (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)).

[25] Id. (quoting Martin, 3 Wn. App. at 410).

Brown alleges a due process violation because the Department neglected to inform her during the dependency that her lack of insight into her children's needs could be considered as a basis for terminating her parental rights.[26]

Brown relies on A.M.M. During the dependency hearing in A.M.M., the Department focused on the mother's substance abuse issues.[27] But during the termination hearing, the mother became aware of another parental deficiency that could support termination when a social worker testified that she lacked an understanding of her children's needs.[28] This court reversed the termination order and remanded for the trial court to strike the finding that the mother's parental deficiencies included a lack of knowledge about her children's developmental needs.[29] While there were extensive findings about the mother's substance abuse, the trial court did not indicate that substance abuse alone was sufficient to warrant termination. On remand, we instructed the trial court to consider whether "termination is appropriate on the basis of the parental deficiencies of which [the mother] was given adequate notice."[30]

---

[26] Pretrial, Brown sought to exclude evidence of any parental deficiency not alleged in the termination petition. The Department did not object, agreeing that the mother's "main deficiencies" were those outlined in the petition. RP (July 16, 2018) at 14. The Department stated that, to the extent the evidence suggested additional deficits, the Department would not rely on them and asked the court to disregard evidence of other deficiencies. Id. at 14-15.

[27] A.M.M., 182 Wn. App. at 783, 792.

[28] Id. at 784.

[29] Id. at 792.

[30] Id. at 793.

This case is different from A.M.M. The petition to terminate Brown's parental rights alleged that her parental deficiencies were "significant mental health issues, lack of parenting skills, and lack of safe and stable housing."[31] The court's finding of parental deficiencies mirrors the Department's allegations. The court expressly identified Brown's parental deficiencies as "mental health issues, lack of parenting skills, and lack of safe and secure housing."[32]

The court discussed the mother's "lack of insight" but not in the context of describing parental deficiencies. Several of the Department's witnesses expressed concerns that the mother was unable or unwilling to protect the children because she strenuously rejected their allegations out-of-hand and appeared unable to appreciate the trauma they suffered. The court, however, was not persuaded that the Department made sufficient efforts to inform the mother of the details of the children's allegations. Therefore, the court found that it was disingenuous for the Department to blame the mother for her lack of awareness or insight as to the sexual abuse allegations. Nevertheless, the court determined the mother still lacked insight into her children's significant needs, regardless of the cause, and this was partly due to the Department's failure to clearly communicate those needs to the mother.[33]

---

[31] Clerk's Papers (CP) at 194.

[32] CP at 19, 215.

[33] CP at 21, 217.

11

The court also explained the mother's lack of insight and inability to appreciate her children's issues affected the likelihood that conditions could be "remedied" so that the children could be "returned to the parent in the near future."[34] The court explained:

> 2.94 The mother, as a non-offending parent, is not a direct danger to her children; she did not assault them. But in order to gain the skills through services that will enable her to help her children and be a placement option, she must acquire the ability to perceive the problem. She has consistently failed to do so since at least March of 2017.
>
> 2.95 Unless the mother begins to change her view, there is no solution as to how she can acquire the necessary skills to provide a stable home for her children in the foreseeable future.[35]

Reading the court's findings in context and as a whole, the court did not find that Brown's lack of insight constituted a parental deficiency and did not rely on it as a basis to terminate her parental rights.

But even if the court's references to Brown's lack of insight are characterized as a parental deficiency separate and distinct from her mental health issues and lack of parenting skills, her reliance on A.M.M. is still unavailing. In contrast to the findings in A.M.M., the findings here indicate that the mother's mental health instability was sufficient to warrant termination of her parental rights. For instance, the court found that the "essential services for the mother" were those directed toward addressing her mental health.[36] And although the mother

---

[34] See RCW 13.34.180(1)(e).

[35] CP at 22, 218.

[36] CP at 216.

12

engaged in mental health services and was no longer "decompensated," the court found that she was not able to function independently and her testimony revealed that something was "terribly wrong" with her thought processes.[37]

The court found that "[s]ince 2006, the mother has not show[n] even 9 to 12 months of mental health stability."[38] The court determined that Brown had demonstrated "no ability" to obtain treatment when she clearly needs it since "[a]ll of her commitments have been involuntary."[39] And the court found that Brown would have to demonstrate at least a year of stability before she could be considered as a potential placement for her children. Critically, the court found:

> 2.85 The fact remains that the mother and her mental health is her own most significant problem.
>
> 2.86 There are no services the Department can offer that will remove the mother's mental health deficiency.[40]

Brown fails to establish a due process violation based on the court's consideration of her lack of insight.

Brown also claims the termination order violates her right to due process because the Department failed to inform her in a timely manner that it would rely on the futility doctrine to excuse its failure to provide all court-ordered services. Pretrial, Brown moved to exclude any testimony regarding the futility of providing

---

[37] CP at 217, 218.

[38] CP at 21, 217.

[39] CP at 218.

[40] CP at 217.

services because the Department failed to include any such allegation in its pleadings. At several points, the court reserved ruling on the defense motion.[41] At the conclusion of the fact-finding hearing, the court rejected the mother's due process claim. The court found:

> 2.70 Social worker Haley Johnston offered reasons as to why services might be futile, citing the mother's cognitive ability, substance abuse, unstable mental health, and lack of insight.
>
> 2.71 It should come as no surprise that a social worker supervisor, and perhaps even a line social worker, would be able to testify as to the facts that would form the basis for an opinion that the offered services were futile.[42]

In the petition to terminate Brown's parental rights, the Department alleged that it had offered or provided all necessary and reasonably available services capable of correcting the mother's parental deficiencies within the foreseeable future.[43] Contrary to the mother's position, this allegation notified her that the Department could potentially assert that its failure to offer services was excusable because those services were not capable of correcting her parental deficiencies within the foreseeable future.

Brown's reliance on A.M.M. is misplaced here too because, as explained, the juvenile court did not terminate her parental rights based on a parental deficiency that she was not made aware of prior to trial. Nothing in A.M.M.

---

[41] The Department filed a memorandum on the last day of trial asserting it was not precluded from arguing that the provision of services would have been futile. CP at 26-29.

[42] CP at 216.

[43] See RCW 13.34.180(1)(d); Ex. 29, ¶ 3.4.

suggests that the Department is required to specify before trial how its provision of particular services to the parent satisfies its burden under RCW 13.34.180(1)(d).

Offer or Provision of Services

Separate from Brown's claimed lack of notice of futility, she challenges the juvenile court's finding that the Department met its burden under RCW 13.34.180(1)(d) because any additional services beyond those directed toward addressing her mental health were futile. To meet its burden under RCW 13.34.180(1)(d), the Department must prove that "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." While the legislature has not defined "necessary services," case law has defined the term to mean "those services 'needed to address a condition that precludes reunification of the parent and child.'"[44] The Department is excused from providing otherwise required services if doing so would be futile.[45] Even when the Department "inexcusably fails" to offer all necessary services, termination may still be appropriate if the service would not

---

[44] K.M.M., 186 Wn.2d at 480 (quoting A.M.M., 182 Wn. App. at 793).
[45] In re Welfare of M.R.H., 145 Wn. App. 10, 25, 188 P.3d 510 (2008).

remedy parental deficiencies within the foreseeable future.[46] The timeframe for "foreseeable future" is dependent on the child's age.[47]

Brown argues that the Department did not meet its burden under RCW 13.34.180(1)(d) because it failed to timely provide her with the opportunity to participate in parenting classes or a support program for victims of domestic violence.[48] She contends that, in addition to being court-ordered, these services were necessary to correct conditions that precluded reunification; namely, lack of insight into her children's needs and lack of parenting skills.

It is undisputed that the Department did not provide Brown with information to facilitate her engagement in parenting classes or a domestic violence victims' support group in Alabama until August 2018, during a break in the termination proceedings.[49] This was approximately two months after Brown's release from inpatient treatment. She claims that because she actively participated in services "throughout the dependency," the Department failed to show that the timely provision of these services would have been futile.[50] The mother further argues

---

[46] K.M.M., 186 Wn.2d at 486.

[47] In re Hall, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983).

[48] Brown does not argue that the Department failed to offer or provide any services related to mental health treatment.

[49] Ex 30. The Department sent Brown two service letters in 2017, providing information to assist the mother in accessing court-ordered mental health services in Alabama. Exs. 19, 20.

[50] Appellant's Br. at 29.

that the court erroneously found that because of her mental health conditions, she could not benefit from parenting classes or services related to domestic violence.

The mother's arguments overlook significant aspects of the court's findings and the factual record. With respect to parenting classes, following an April 2017 permanency planning hearing, the court ordered the mother to participate in parenting classes *only* if she wanted to "be a future parenting resource."[51] As explained, apart from one instance, the mother consistently expressed a preference for the children to be placed with her father.

Following a review hearing in October 2017, the court added a domestic violence victim support group to the list of required services.[52] But around the same time, the mother was involuntarily committed. As the court noted, neither parenting classes nor domestic violence victim programs were available at the inpatient treatment facility where the mother resided between October 2017 and June 2018. And even assuming the Department unreasonably delayed providing information to Brown about services after her release from inpatient treatment, the court found that parenting classes were not an essential service, that the predominant issue precluding reunification was the mother's chronic mental health instability, that mental health services were provided to the mother, and the provision of any additional services would have been futile.

In this regard, the court found:

---

[51] Ex. 9, ¶ 3.9.
[52] Ex. 10, ¶ 3.10.

2.76 The essential services have been provided but it has not made the mother ready for reunification and she will not be ready for reunification in the children's foreseeable future.

. . . .

2.78 As Ms. Johnston testified to, the mother would have to demonstrate at least a year of stability before she could be under consideration as a stable parent. This is the problem. Additional services would have been futile.

. . . .

2.86 There are no services the Department can offer that will remove the mother's mental health deficiency.

2.87 The mother's mental health deficiency was not removed by seven to eight months of involuntary treatment.

. . . .

2.89 It took seven to eight months to stabilize the mother; this is a staggering reality.

2.90 Even if the mother was to start all services now, she cannot demonstrate sufficient stability in the foreseeable future to justify denying termination.[53]

The court did not find that the mother could not benefit from parenting classes or domestic violence services. Instead, the court found there was no service capable of correcting the primary deficiency, mental health instability, within the foreseeable future. This finding is supported by evidence in the record that it took seven to eight months of inpatient treatment to stabilize Brown in 2017 and 2018. There was also evidence of several prior involuntary commitments and

---

[53] CP at 21, 217.

no evidence that the mother had experienced any significant period of mental health stability in more than 10 years. One former Department supervisor testified that the mother would need to show consistent engagement and mental health stability for a year in order to establish long-term success in treatment and that, for her children, three months was beyond their foreseeable future.[54] Another Department supervisor testified that the mother would need to remain stable in mental health treatment for a minimum of nine to twelve months to be considered as a placement for her children and that six months was almost beyond the near future for the two children.[55] The GAL also testified that Brown had not sufficiently addressed her mental health condition to enable her to parent the children and that the near future for the children was six months, at the very latest.[56]

Furthermore, while the mother claims that she participated in services throughout the dependency, she glosses over the fact that, for the most part, her participation in court-ordered mental health services was not voluntary. And at trial, while the mother claimed she was interested in participating in parenting classes and services related to domestic violence, she also testified that she was not currently prepared to begin any new services until her mother purchased a new vehicle.

---

[54] RP (July 17, 2018) at 121-22.

[55] Id. at 208-10.

[56] RP (Aug. 28, 2018) at 82-86.

Although the mother challenges the court's finding that she participated in mental health services "to no avail," she misinterprets the finding. The court found that the mental health treatment succeeded to the extent that Brown was eventually stabilized and no longer "decompensated."[57] Nevertheless, because Brown was released from inpatient treatment only a month before the fact-finding hearing began, it remained to be seen if she could maintain stability. And while the mother exhibited "some degree" of mental "evenness," the court also found that she exhibited some delusional thinking.[58]

Brown also claims that the court erroneously applied a rebuttable presumption to RCW 13.34.180(1)(d) and therefore unlawfully placed a burden of production on her "to prove that circumstances would improve in the foreseeable future."[59] RCW 13.34.180(1)(e) requires proof "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future."[60] RCW 13.34.180(1)(e) also provides that if the Department meets its burden under RCW 13.34.180(1)(d) by showing that all necessary services reasonably capable of correcting the parental deficiencies within the <u>foreseeable future</u> have been clearly offered or provided and the parent has failed to substantially improve his or her parental deficiencies within 12 months following

---

[57] CP at 217.

[58] CP at 22; 218.

[59] Appellant's Br. at 33.

[60] (Emphasis added.)

entry of the dispositional order, then a rebuttable presumption arises that there is little likelihood that return of the child in the near future will be possible.

Here, the court found:

2.92  It has been well over 12 months since a dispositional order has entered and the Department has offered or provided all services. The rebuttable presumption applies.[61]

Nothing in this finding indicates that the court mistakenly applied a presumption to find the Department satisfied its burden under RCW 13.34.180(d). In order for the presumption under RCW 13.34.180(1)(e) to apply, the Department must first make a showing that necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided.  The next finding, 2.93, states that the Department met its burden under RCW 13.34.180(1)(d) in part, because "[n]o other services would have remedied the mother's parental deficiencies in the foreseeable future."[62] These findings do not suggest any confusion about the statutory factor to which the rebuttable presumption applies.

Substantial evidence supports the court's findings that the Department met its burden under RCW 13.34.180(1)(d) by offering or providing mental health services and that any additional services were futile because they were not capable of correcting Brown's chronic mental health condition in the foreseeable future.

---

[61] CP at 22, 218.

[62] Id. (emphasis added)

We affirm the termination orders.

WE CONCUR:

_____

Mann, A.C.J.